POSNER, Chief Judge.
This appeal raises the difficult issue of the standard for valuing secured claims in a Chapter 13 bankruptcy. When secured claims are filed in a liquidation (Chapter 7), the most common form of bankruptcy, the debtor’s assets are sold and from the proceeds of the sale the secured creditors recover the market value of their collateral, plus, if they are undersecured — that is, owed more than those proceeds — the equivalent of deficiency judgments in the form of unsecured claims for the difference between what they are owed and what their collateral fetched at the sale. We say when secured claims are made in a liquidation because unless the secured creditor is oversecured (which would mean that the debtor retained equity in the collateral) he has, in principle, the alternative of bypassing the bankruptcy and foreclosing on his lien, In re Tarnow, 749 F.2d 464, 465 (7th Cir.1984), although it will ordinarily be to his advantage to file a claim, Lynn M. LoPucki, Strategies for Creditors in Bankruptcy Proceedings §§ 7.5, 7.8, and p. 400 (2d ed. 1991), and he may even find himself dragged into the bankruptcy proceeding against his will. In re Lindsey, 823 F.2d 189, 191 (7th Cir.1987).
The price obtained in a liquidation is usually a wholesale rather than a retail price. Retail value is simply wholesale value plus the costs of selling at retail, In re Ebbler Furniture & Appliances, Inc., 804 F.2d 87, 92 (7th Cir.1986) (concurring opinion), and *313 those costs are avoided when the collateral is sold by a repossessing creditor who is not himself a retad dealer, or by his surrogate, the sheriff or a trustee in bankruptcy, see Douglas G. Baird & Thomas H. Jackson, Cases, Problems, and Materials on Bankruptcy 10 (2d ed. 1990) — neither of whom is a retail dealer-rather than by a secured creditor who does happen to be a retailer. Liquidation value, in other words, normally is wholesale value. Once in a while a secured claim must be valued in a Chapter 7 proceeding, rather than enforced through the sale of the collateral. This might be necessary because the assets have been sold in a bloc and the proceeds have to be allocated among the secured creditors, or to determine whether the debtor has any equity in the collateral or how much he must offer in order to redeem the collateral. 11 U.S.C. §§ 362(d)(2)(A), 722. But we can disregard these exceptions to the use of the market to place a value on the debtor’s assets in a liquidation.
In a corporate reorganization under Chapter 11 of the Bankruptcy Code, the debtor retains its assets. Any secured creditor who is neither paid in full on the spot nor permitted to foreclose on his lien exchanges his original security interest for a new interest — common or preferred stock, or debentures or some other type of bond. Chapter 13 is a counterpart to Chapter 11, but for individuals who have a regular income, rather than for business firms. In re Schaitz, 913 F.2d 452, 453 (7th Cir.1990). Chapter 13 authorizes the bankruptcy court to confirm a plan under which the debtor will be permitted to retain possession of the collateral of his secured creditors, and the creditors (both secured and unsecured) will in effect refinance their loans, much as in a- Chapter 11 reorganization. The secured creditor is entitled to receive a security interest, or other property, at least as valuable as his original secured claim, 11 U.S.C. § 1325(a)(5)(B), so it becomes essential to value that original claim. That value is defined by section 506(a) as [1] “the value of [the] creditor’s interest in the estate’s interest in [the] property” of the debtor’s estate in which the creditor has his lien, [2] as “determined in light of the purpose of the valuation and of the proposed disposition or use of [the] property.”
NBD Bank, the appellant, has a lien on the Hoskinses’ 1990 Ford Tempo. The trustee in bankruptcy, in his proposed Chapter 13 plan, valued the bank’s secured claim at $3,987.50, which is midway between the stipulated retail value of the car, $4,650.00, and the stipulated wholesale value, $3,325.00. The bankruptcy court confirmed the plan, including the valuation of the car proposed by the trustee. 183 B.R. 166 (Bankr.S.D.Ind.1995). The district judge affirmed. The bank appeals, contending that the retail value is the proper value.
The briefs and arguments of the parties are full of false starts. Both sides appeal to the “plain meaning” of section 506(a) — a bad sign. Both claim the authority of ease law for their position, while acknowledging as they must that the circuits are divided on the proper standard for valuing the interests of secured creditors in Chapter 13 proceedings. Compare In re Rash, 90 F.3d 1036, 1060-61 (5th Cir.1996) (en banc) (wholesale value), with In re Taffi, 96 F.3d 1190 (9th Cir.1996) (en banc) (Chapter 11); In re Trimble, 50 F.3d 530 (8th Cir.1995); In re Winthrop Old Farm Nurseries, Inc., 50 F.3d 72, 74-76 (1st Cir.1995) (Chapter 11); In re McClurkin, 31 F.3d 401, 404-05 (6th Cir.1994); In re Coker, 973 F.2d 258, 260 (4th Cir.1992) (all retail value); see generally 2 Keith M. Lundin, Chapter 13 Bankruptcy § 5.48 (2d ed. 1994). When there is a circuit split, there is no “authority” to guide the undecided circuits. Authority is a ground for decision over and above reasons, and so drops out when the courts to whose authority another court might defer cannot agree on the proper resolution of the issue. We are not bound by the decision of another circuit. But if the only other circuit or circuits to have decided the issue had decided it one way, this would be a reason over and above the reasoning employed in those decisions for following them.
At argument the bank’s counsel asserted ill-advisedly that nothing turns on the fact that this is a Chapter 13 case. Much may, since, as we have seen, the usual value of a secured claim in a Chapter 7 bankruptcy is *314 its liquidation value, which normally is its wholesale value, and the bank is claiming retail value. But we hesitate to bind parties by concessions made in the heat of oral argument, and shall not do so here. For his part the trustee, though he had proposed a valuation midway between retail and wholesale value and the bankruptcy and district judges had accepted it, has not defended this midpoint as being a proper standard, for valuation. He argues that valuation is to be done on an ad hoc basis, case by case, and that since the bankruptcy judge not unreasonably found that splitting the difference would be the “equitable” solution in this case, we are bound by it. But it is one thing to say that a uniform standard of valuation must be applied case by case, since application depends on the facts and they are different from ease to case. It is another thing to say that there is no standard. Although there is some support in the legislative history for such an approach, H.R.Rep. No. 595, 95th Cong., 2d Sess., at 356 (1978); S.Rep. No. 989, 95th Cong., 2d Sess., at 68 (1978) U.S.Code Cong. & Admin.News 1978, at 5787, it would be peculiarly inappropriate to the valuation of Chapter 13 property. These are tiny cases. The debtor usually has few assets. To prevent the costs of bankruptcy litigation from eating up the entire debtor’s estate, a simple rule of valuation is needed. Wholesale price is one simple rule; retail price another; the midpoint of the two prices is a third. None is enacted or excluded by the statute. We must decide which is best.
We get little help from the statute. The “value of creditor’s interest” clause does not seem to bear on the question at all. “Value” is not defined; and, so far as appears, the word “creditor’s” is just meant to remind us that a lien is not coextensive with the property that it is a lien on. The legislative history points both toward and away from equating “creditor’s interest” to wholesale value. Compare H.R.Rep. No. 595, supra, at 124, with id. at 356. The clause that we earlier denoted by [2] — “such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of [the] property” — is somewhat tautological, somewhat opaque, but also somewhat helpful. Of course value should be determined in light of the purpose of the valuation, but the purpose is merely to give the secured creditor the value of his security interest, so we are back to square one. But not entirely. Because that value will differ among the different stages and kinds of bankruptcy, the reference to “purpose” could imply usefully that the section 506(a) standard of valuation is not unitary. Specifically, it may mean something different in a Chapter 13 case from what it means in a Chapter 7 ease, contrary to the bank’s concession.
The reference to “the proposed disposition or use of [the] property” might seem to imply that a debtor who is intending to use the property to generate income should be given a break. The higher the value placed by the bankruptcy court on retained collateral, the heavier the payments that the debtor will be required to make under the plan to keep the collateral and so the likelier he will be to fail to keep up the payments and thus lose the collateral after all. This loss will work to the disadvantage of the debtor and his unsecured creditors — the latter both directly, by reducing the fraction of the debtor’s future income that is available for the satisfaction of their claims, and indirectly if as a result of the debtor’s loss of an income-producing asset, such as an automobile used in his job or to get to and from it, the debtor’s income falls before he has completed his stretehed-out payments to the unsecured creditors.
Yet we hesitate to read section 506(a) as designed to give either the debtor or the unsecured creditors a substantive advantage they would not have if they were trying to enforce their rights outside of bankruptcy. A policy of preferring unsecured to secured creditors, or debtors to either, is contrary to the lodestar that guides the administration of bankruptcy: bankruptcy preserves rather than alters creditors’ preexisting entitlements, and merely consolidates their claims in order to prevent a race to dismember the debtor that may make the creditors as a whole worse off. Butner v. United States, 440 U.S. 48, 55-56, 99 S.Ct. 914, 918-19, 59 L.Ed.2d 136 (1979); Baird & Jackson, supra, at 42. The unsecured creditors get a break, moreover, whenever the debtor is permitted to retain an asset that can be used to help *315 generate income to pay their claims, rather than being forced to give up the asset to the secured creditors forthwith, as would be the effect of liquidation. Unsecured creditors usually get nothing in the Chapter 7 bankruptcy of an individual. 2 David G. Epstein, Steve H. Nickles & James J. White, Bankruptcy § 7.1, p. 280 (1992); 2 id., § 7.9, p. 300. Chapter 13 is by its very design, and without need to alter creditors’ preexisting entitlements, a boon to the unsecured creditor.
The Ninth Circuit in Taffi thought that the word “use” in the second clause points to retail value in a ease in which the debtor is going to continue to use the property. Wholesale value — the value that would be realized if the debtor were not going to continue using the property, if instead the property were sold — cannot be right for a case in which the property is not sold. 96 F.3d at 1192. This would be a good argument if retail value were the only alternative to wholesale value, but, as the present case illustrates, it is not. The midpoint between the two values is another alternative and one the Ninth Circuit did not consider. The significance of the statute’s reference to different possible uses of retained collateral is that it invites judicial attention to an economic problem that may well be acute in cases in which the collateral is essential to the debt- or’s livelihood. The economic problem is that of bilateral monopoly, a concept that is no longer a stranger to the law, see, e.g., Walgreen Co. v. Sara Creek Property Co., 966 F.2d 273, 276 (7th Cir.1992); Milbrew, Inc. v. Commissioner, 710 F.2d 1302, 1306-07 (7th Cir.1983), and that can help with the interpretation of this vague bankruptcy statute. The term “bilateral monopoly” refers to a situation in which two persons can bargain over some thing of value only with each other; neither can rely on competition to determine the price of the thing. An example familiar to lawyers is the settlement of a simple two-party suit for damages. The plaintiff can settle only with the defendant, and the defendant only with the plaintiff. Suppose that the plaintiff calculates the net value to himself of going to trial rather than settling as $20,000, and the defendant calculates the net cost to himself of trial rather than settlement as $40,000. At any settlement between $20,000 and $40,000 both parties will consider themselves better off than they would be by going to trial.
Were it not for Chapter 13, the relation between secured creditor and defaulting debtor would be as good an example of bilateral monopoly as the settlement of a lawsuit is. If the Hoskinses had defaulted on the loan from NBD secured by their Ford and there had been no bankruptcy proceeding, the bank could have seized and sold the car. It would obtain only the wholesale value, because banks are not in the retail automobile business. It might obtain a deficiency judgment as well and seek to garnish the Hoskinses’ wages or to levy on their other assets in order to collect; but that is a right that it retains, in effect, in bankruptcy as well, in the form of a right to make an unsecured claim for the difference between the value of the collateral and the amount of the loan. The issue for us is what that value would be outside bankruptcy, and it would be what the bank would get for the ear if it seized it.
By seizing the car, the bank would not be recovering its loan in full but it would be depriving the Hoskinses of automotive transportation. Supposing they needed the ear— and most Americans who live outside of New York City regard a car as a necessity rather than a luxury, whether or not they need it in order to be able to hold a job — they would find themselves having to buy a new one, for which presumably they would have to pay the retail price. That is one reason the bank’s concern that if the debtor’s car is valued at less than retail value the debtor will turn around and sell it at retail and gain a windfall is a chimera. Another reason is that an individual, as distinct from a retail dealer, is unlikely to be able to sell a car for its full retail value, if only because he could not give a meaningful warranty.
This analysis shows that while the bank would not agree to forgive or stretch out the loan for less than a package of rights worth as much as the wholesale price of the car, the Hoskinses would not agree to refinance the loan on the basis of a value of the ear greater *316 than its retail value. At any price between these two valuations, both parties would be better off than if the bank repossessed the car — the Hoskinses (and presumably the general creditors as well, for the reasons explained earlier) because they would be retaining their automobile at a price less than the price to them of a comparable automobile; the bank because it would be getting a new secured interest worth more than the wholesale price, the price the bank would get if it seized and sold the car.
There is no way to predict where in the bargaining range the bargain would be struck. But to economize on bargaining costs, people who find themselves in a bilateral monopoly situation will often agree simply to split the difference. The midpoint is what game theorists call a “focal point,” a natural point to which bargaining parties will gravitate if they don’t want to waste a lot of time in bluffing and haggling. See, e.g., Douglas G. Baird, Robert H. Gertner & Randal C. Picker, Game Theory and the Law 39 (1994). So the midpoint of the bargaining range, which is the point that the bankruptcy court chose in this case, is a reasonable approximation of the likely average valuation of the debtor’s automobile that the secured creditor and defaulting debtor would agree upon (were there no Chapter 13) in .the type of situation for which Chapter 13 was designed — the insolvency of an individual debt- or with a regular income. Since it is desirable to have a rule for determining value in these low-value cases rather than a flabby standard, and since the midpoint rule is superior from the standpoint of the underlying economics of the situation to either of the alternative rules — wholesale value or retail value — we hold that in Chapter 13 cases involving automobiles and similar assets used to produce income for the debtor the value of the secured interest is the average of the retail and the wholesale value of the collateral.
We said earlier that bankruptcy preserves rather than alters creditors’ preexisting entitlements; so if the bank’s entitlement, were it to proceed to enforce its lien against the Hoskinses’ car outside bankruptcy, were to the wholesale value of the car, or to the retail value of the car, or to the midpoint of those values, we would not have had to discuss the economics of the bank’s position. But the bank’s entitlement, were it to proceed under state law, would be merely to dispose of the car in a commercially reasonable manner. UCC § 9-504. Whatever the commercially reasonable mode of disposition fetched would be the value of the lien, up to the amount due the bank on its loan. One commercially reasonable disposition would be to let the debtors retain the use of their car in exchange for a new schedule of payments that would compensate the bank for surrendering (or deferring) its right to foreclose. In that event the value realized on the lien by the (perfectly lawful) threat to foreclose might well exceed the car’s auction value. It just is not possible to attach a determinate value to the bank’s hen outside bankruptcy.
We do not think that the midpoint solution is inconsistent with the Supreme Court’s decision in Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 129-31, 60 S.Ct. 1, 13-15, 84 L.Ed. 110 (1939), which holds that a plan for reorganization under Chapter 11 is unfair to creditors if it gives the shareholders a large stake in the reorganized firm merely because the shareholders have the practical power to frustrate the reorganization. The Court explained that by filing for protection under Chapter 11, the shareholders had given up their control of the firm and any strategic power conferred by that control. Id. at 130, 60 S.Ct. at 14. Shareholders are not creditors; they are the debtor’s owners, and to allow them to wring concessions from the creditors would be contrary to the policy of the bankruptcy laws. Nothing of that kind is involved here. Closer perhaps is the concept of voidable preference, 11 U.S.C. § 547, which prevents a creditor who may have a strategic hold over the debtor from using this hold to gain an advantage over the other creditors. But there it is the Bankruptcy Code itself that, for reasons fundamental to bankruptcy’s purpose of preventing a mutually destructive feeding frenzy by creditors, forbids a creditor to duplicate in bankruptcy a strategic advantage that he might enjoy outside it.
*317 The dispute between creditors in this ease cannot be resolved by reference to any policy of bankruptcy law other than trying to give creditors in bankruptcy what they would get outside it, at least if that can be accomplished by means of a simple rule. If secured creditors’ liens are valued at only their wholesale value in a Chapter 13 case, the unsecured creditors will receive a windfall compared to what they would have received outside bankruptcy, because if the car had been seized and sold by the secured creditor the Hos-kinses might have lost their regular income out of which the unsecured creditors hope to recover a portion at least of their loans. If secured creditors are entitled to value their secured interests at retail value, the bank obtains the windfall, at the expense of the unsecured creditors, because the bank would not have gotten retail value had it seized and sold the car. The rule we adopt is necessary to avoid windfalls, and in fact to neutralize the strategic power that either set of creditors would enjoy under the alternative rules. Retail value would reward the bank for its being able outside of bankruptcy to threaten to take away the Hoskinses’ car and with it perhaps their livelihood, and wholesale value would reward the unsecured creditors for the Hoskinses’ being able outside of bankruptcy to threaten to abandon the car to the bank, which, if that happened, could probably obtain no more than wholesale value for it.
We need not attempt to decide the proper rule for valuing other types of asset in Chapter 13 cases. A serious bilateral monopoly problem could also arise in the ease of an asset that had sentimental value for the debt- or, or in the case of a residence with or without sentimental value if the owner would face substantial relocation costs if forced to move. In either case there would be a substantial bargaining range. We leave the issue of valuation presented by these assets to be resolved another day, as we do the implications (if any) of our analysis for Chapter 11 cases. Chapter 11 entitles the secured creditor to what he would receive “if the debtor were liquidated under chapter 7.” 11 U.S.C. § 1129(a)(7)(A)(ii). But that is not the only floor. He is entitled to “the value of [his] interest in the estate’s interest in the property,” which is section 506(a) terminology. 11 U.S.C. § 1129(b)(2)(A)(i)(II); 3 Collier on Bankruptcy para. 506.01 (15th ed., Lawrence P. King ed. 1996). As we noted earlier, the second clause, the purpose and disposition clause, of section 506(a) implies that a uniform method for valuing different kinds of asset or in different kinds of bankruptcy proceeding is not required.
Affirmed.