ASSOCIATES COMMERCIAL CORP. *v.* RASH ET UX.

No. 96–454.   Argued April 16, 1997—Decided June 16, 1997

954

*Carter G. Phillips* argued the cause for petitioner. With him on the briefs were *Shalom L. Kohn, David M. Schiffman, Ben L. Aderholt,* and *Raymond J. Blackwood.*

*Kent L. Jones* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Argrett, Deputy Solicitor General Wallace,* and *Gary D. Gray.*

*John J. Durkay* argued the cause and filed a brief for respondents.*

JUSTICE GINSBURG delivered the opinion of the Court.†

We resolve in this case a dispute concerning the proper application of § 506(a) of the Bankruptcy Code when a bankrupt debtor has exercised the "cram down" option for which Code § 1325(a)(5)(B) provides. Specifically, when a debtor, over a secured creditor's objection, seeks to retain and use the creditor's collateral in a Chapter 13 plan, is the value of the collateral to be determined by (1) what the secured creditor could obtain through foreclosure sale of the property (the "foreclosure-value" standard); (2) what the debtor would have to pay for comparable property (the "replacement-

---

*Briefs of *amici curiae* urging reversal were filed for NationsBank, N. A., et al. by *John H. Culver III;* and for the Washington Legal Foundation by *David R. Kuney, Daniel J. Popeo,* and *Penelope K. Shapiro.*

Briefs of *amici curiae* urging affirmance were filed for the National Association of Chapter 13 Trustees by *Henry E. Hildebrand* and *Christopher M. Minton;* for the National Association of Consumer Bankruptcy Attorneys, Inc., by *Norma L. Hammes* and *James J. Gold;* and for Donald and Madelaine Taffi by *A. Lavar Taylor.*

*Jan T. Chilton* and *Phillip D. Brady* filed a brief for the American Automobile Manufacturers Association, Inc., et al. as *amici curiae.*

†JUSTICE SCALIA joins all but footnote 4 of this opinion.

value" standard); or (3) the midpoint between these two measurements? We hold that § 506(a) directs application of the replacement-value standard.

## I

In 1989, respondent Elray Rash purchased for $73,700 a Kenworth tractor truck for use in his freight-hauling business. Rash made a downpayment on the truck, agreed to pay the seller the remainder in 60 monthly installments, and pledged the truck as collateral on the unpaid balance. The seller assigned the loan, and its lien on the truck, to petitioner Associates Commercial Corporation (ACC).

In March 1992, Elray and Jean Rash filed a joint petition and a repayment plan under Chapter 13 of the Bankruptcy Code (Code), 11 U. S. C. §§ 1301–1330. At the time of the bankruptcy filing, the balance owed to ACC on the truck loan was $41,171. Because it held a valid lien on the truck, ACC was listed in the bankruptcy petition as a creditor holding a secured claim. Under the Code, ACC's claim for the balance owed on the truck was secured only to the extent of the value of the collateral; its claim over and above the value of the truck was unsecured. See 11 U. S. C. § 506(a).

To qualify for confirmation under Chapter 13, the Rashes' plan had to satisfy the requirements set forth in § 1325(a) of the Code. The Rashes' treatment of ACC's secured claim, in particular, is governed by subsection (a)(5).[1] Under this

---

[1] Section 1325(a)(5) states:

"(a) Except as provided in subsection (b), the court shall confirm a plan if—

. . . . .

"(5) with respect to each allowed secured claim provided for by the plan—

"(A) the holder of such claim has accepted the plan;

"(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

"(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

provision, a plan's proposed treatment of secured claims can be confirmed if one of three conditions is satisfied: The secured creditor accepts the plan, see 11 U. S. C. § 1325(a)(5)(A); the debtor surrenders the property securing the claim to the creditor, see § 1325(a)(5)(C); or the debtor invokes the so-called "cram down" power, see § 1325(a)(5)(B). Under the cram down option, the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, see § 1325(a)(5)(B)(i), and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, i. e., the present value of the collateral, see § 1325(a)(5)(B)(ii). The value of the allowed secured claim is governed by § 506(a) of the Code.

The Rashes' Chapter 13 plan invoked the cram down power. It proposed that the Rashes retain the truck for use in the freight-hauling business and pay ACC, over 58 months, an amount equal to the present value of the truck. That value, the Rashes' petition alleged, was $28,500. ACC objected to the plan and asked the Bankruptcy Court to lift the automatic stay so ACC could repossess the truck. ACC also filed a proof of claim alleging that its claim was fully secured in the amount of $41,171. The Rashes filed an objection to ACC's claim.

The Bankruptcy Court held an evidentiary hearing to resolve the dispute over the truck's value. At the hearing, ACC and the Rashes urged different valuation benchmarks. ACC maintained that the proper valuation was the price the Rashes would have to pay to purchase a like vehicle, an amount ACC's expert estimated to be $41,000. The Rashes, however, maintained that the proper valuation was the net amount ACC would realize upon foreclosure and sale of the collateral, an amount their expert estimated to be $31,875.

---

"(C) the debtor surrenders the property securing such claim to such holder."

The Bankruptcy Court agreed with the Rashes and fixed the amount of ACC's secured claim at $31,875; that sum, the court found, was the net amount ACC would realize if it exercised its right to repossess and sell the truck. See *In re Rash*, 149 B. R. 430, 431–432 (Bkrtcy. Ct. ED Tex. 1993). The Bankruptcy Court thereafter approved the plan, and the United States District Court for the Eastern District of Texas affirmed.

A panel of the Court of Appeals for the Fifth Circuit reversed. *In re Rash*, 31 F. 3d 325 (1994). On rehearing en banc, however, the Fifth Circuit affirmed the District Court, holding that ACC's allowed secured claim was limited to $31,875, the net foreclosure value of the truck. *In re Rash*, 90 F. 3d 1036 (1996).

In reaching its decision, the Fifth Circuit highlighted, first, a conflict it perceived between the method of valuation ACC advanced, and the law of Texas defining the rights of secured creditors. See *id.*, at 1041–1042 (citing Tex. Bus. & Com. Code Ann. §§ 9.504(a), (c), 9.505 (1991)). In the Fifth Circuit's view, valuing collateral in a federal bankruptcy proceeding under a replacement-value standard—thereby setting an amount generally higher than what a secured creditor could realize pursuing its state-law foreclosure remedy—would "chang[e] the extent to which ACC is secured from what obtained under state law prior to the bankruptcy filing." 90 F. 3d, at 1041. Such a departure from state law, the Fifth Circuit said, should be resisted by the federal forum unless "clearly compel[led]" by the Code. *Id.*, at 1042.

The Fifth Circuit then determined that the Code provision governing valuation of security interests, § 506(a), does not compel a replacement-value approach. Instead, the court reasoned, the first sentence of § 506(a) requires that collateral be valued from the creditor's perspective. See *id.*, at 1044. And because "the creditor's interest is in the nature of a security interest, giving the creditor the right to repos-

sess and sell the collateral and nothing more[,] . . . the valuation should start with what the creditor could realize by exercising that right." *Ibid.* This foreclosure-value standard, the Fifth Circuit found, was consistent with the other relevant provisions of the Code, economic analysis, and the legislative history of the pertinent provisions. See *id.*, at 1045–1059. Judge Smith, joined by five other judges, dissented, urging that the Code dictates a replacement-value standard. See *id.*, at 1061–1075.

Courts of Appeals have adopted three different standards for valuing a security interest in a bankruptcy proceeding when the debtor invokes the cram down power to retain the collateral over the creditor's objection. In contrast to the Fifth Circuit's foreclosure-value standard, a number of Circuits have followed a replacement-value approach. See, *e. g., In re Taffi,* 96 F. 3d 1190, 1191–1192 (CA9 1996) (en banc), cert. pending *sub nom. Taffi* v. *United States,* No. 96–881;[2] *In re Winthrop Old Farm Nurseries, Inc.,* 50 F. 3d 72, 74–75 (CA1 1995); *In re Trimble,* 50 F. 3d 530, 531–532 (CA8 1995). Other courts have settled on the midpoint between foreclosure value and replacement value. See *In re Hoskins,* 102 F. 3d 311, 316 (CA7 1996); cf. *In re Valenti,* 105 F. 3d 55, 62 (CA2 1997) (bankruptcy courts have discretion to value at midpoint between replacement value and foreclosure value). We granted certiorari to resolve this conflict among the Courts of Appeals, see 519 U. S. 1086 (1997), and we now reverse the Fifth Circuit's judgment.

---

[2] In *In re Taffi,* the Ninth Circuit contrasted replacement value with fair-market value and adopted the latter standard, apparently viewing the two standards as incompatible. See 96 F. 3d, at 1192. By using the term "replacement value," we do not suggest that a creditor is entitled to recover what it would cost the debtor to purchase the collateral brand new. Rather, our use of the term replacement value is consistent with the Ninth Circuit's understanding of the meaning of fair-market value; by replacement value, we mean the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition. See also *infra,* at 965, n. 6.

## II

The Code provision central to the resolution of this case is § 506(a), which states:

> "An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value ·of such creditor's interest . . . is less than the amount of such allowed claim.   Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property . . . ." 11 U. S. C. § 506(a).

Over ACC's objection, the Rashes' repayment plan proposed, pursuant to § 1325(a)(5)(B), continued use of the property in question, *i. e.*, the truck, in the debtor's trade or business. In such a "cram down" case, we hold, the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller.

Rejecting this replacement-value standard, and selecting instead the typically lower foreclosure-value standard, the Fifth Circuit trained its attention on the first sentence of § 506(a).   In particular, the Fifth Circuit relied on these first sentence words: A claim is secured "to the extent of the value of such *creditor's interest* in the estate's interest in such property."   See 90 F. 3d, at 1044 (emphasis added) (citing § 506(a)).   The Fifth Circuit read this phrase to instruct that the "starting point for the valuation [is] what the creditor could realize if it sold the estate's interest in the property according to the security agreement," namely, through "repossess[ing] and sell[ing] the collateral."   *Ibid.*

We do not find in the § 506(a) first sentence words—"the creditor's interest in the estate's interest in such property"—

the foreclosure-value meaning advanced by the Fifth Circuit. Even read in isolation, the phrase imparts no valuation standard: A direction simply to consider the "value of such creditor's interest" does not expressly reveal *how* that interest is to be valued.

Reading the first sentence of § 506(a) as a whole, we are satisfied that the phrase the Fifth Circuit considered key is not an instruction to equate a "creditor's interest" with the net value a creditor could realize through a foreclosure sale. The first sentence, in its entirety, tells us that a secured creditor's claim is to be divided into secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral. See *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 238–239 (1989); 4 L. King, Collier on Bankruptcy ¶ 506.02[1][a], p. 506–6 (15th ed. rev. 1996). To separate the secured from the unsecured portion of a claim, a court must compare the creditor's claim to the value of "such property," *i. e.*, the collateral. That comparison is sometimes complicated. A debtor may own only a part interest in the property pledged as collateral, in which case the court will be required to ascertain the "estate's interest" in the collateral. Or, a creditor may hold a junior or subordinate lien, which would require the court to ascertain the creditor's interest in the collateral. The § 506(a) phrase referring to the "creditor's interest in the estate's interest in such property" thus recognizes that a court may encounter, and in such instances must evaluate, limited or partial interests in collateral. The full first sentence of § 506(a), in short, tells a court what it must evaluate, but it does not say more; it is not enlightening on how to value collateral.

The second sentence of § 506(a) does speak to the *how* question. "Such value," that sentence provides, "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." § 506(a). By deriving a foreclosure-value standard from § 506(a)'s first sentence, the Fifth Circuit rendered inconsequential the

sentence that expressly addresses how "value shall be determined."

As we comprehend § 506(a), the "proposed disposition or use" of the collateral is of paramount importance to the valuation question. If a secured creditor does not accept a debtor's Chapter 13 plan, the debtor has two options for handling allowed secured claims: surrender the collateral to the creditor, see § 1325(a)(5)(C); or, under the cram down option, keep the collateral over the creditor's objection and provide the creditor, over the life of the plan, with the equivalent of the present value of the collateral, see § 1325(a)(5)(B). The "disposition or use" of the collateral thus turns on the alternative the debtor chooses—in one case the collateral will be surrendered to the creditor, and in the other, the collateral will be retained and used by the debtor. Applying a foreclosure-value standard when the cram down option is invoked attributes no significance to the different consequences of the debtor's choice to surrender the property or retain it. A replacement-value standard, on the other hand, distinguishes retention from surrender and renders meaningful the key words "disposition or use."

Tying valuation to the actual "disposition or use" of the property points away from a foreclosure-value standard when a Chapter 13 debtor, invoking cram down power, retains and uses the property. Under that option, foreclosure is averted by the debtor's choice and over the creditor's objection. From the creditor's perspective as well as the debtor's, surrender and retention are not equivalent acts.

When a debtor surrenders the property, a creditor obtains it immediately, and is free to sell it and reinvest the proceeds. We recall here that ACC sought that very advantage. See *supra*, at 957. If a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use. Adjustments in the interest rate and secured

creditor demands for more "adequate protection," 11 U. S. C. § 361, do not fully offset these risks. See 90 F. 3d, at 1066 (Smith, J., dissenting) ("vast majority of reorganizations fail . . . leaving creditors with only a fraction of the compensation due them"; where, as here, "collateral depreciates rapidly, the secured creditor may receive far less in a failed reorganization than in a prompt foreclosure" (internal cross-reference omitted)); accord, *In re Taffi*, 96 F. 3d, at 1192–1193.[3]

Of prime significance, the replacement-value standard accurately gauges the debtor's "use" of the property. It values "the creditor's interest in the collateral in light of the proposed [repayment plan] reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to . . . its [replacement] value." *In re Winthrop Old Farm Nurseries*, 50 F. 3d, at 75. The debtor in this case elected to use the collateral to generate an income stream. That actual use, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's "disposition or use." See *ibid.*[4]

---

[3] On this matter, *amici curiae* supporting ACC contended: "'Adequate protection' payments under 11 U. S. C. §§ 361, 362(d)(1) typically are based on the assumption that the collateral will be subject to only ordinary depreciation. Hence, even when such payments are made, they frequently fail to compensate adequately for the usually more rapid depreciation of assets retained by the debtor." Brief for American Automobile Manufacturers Association, Inc., et al. as *Amici Curiae* 21, n. 9.

[4] We give no weight to the legislative history of § 506(a), noting that it is unedifying, offering snippets that might support either standard of valuation. The Senate Report simply repeated the phrase contained in the second sentence of § 506(a). See S. Rep. No. 95–989, p. 68 (1978). The House Report, in the Fifth Circuit's view, rejected a "'replacement cost'" valuation. See *In re Rash*, 90 F. 3d 1036, 1056 (CA5 1996) (quoting H. Rep. No. 95–595, p. 124 (1977)). That Report, however, appears to use the term "replacement cost" to mean the cost of buying new property to replace property in which a creditor had a security interest. See *ibid.* In any event, House Report excerpts are not enlightening, for the provision pivotal here—the second sentence of § 506(a)—did not appear in the bill addressed by the House Report. The key sentence originated in the

The Fifth Circuit considered the replacement-value standard disrespectful of state law, which permits the secured creditor to sell the collateral, thereby obtaining its net foreclosure value "and nothing more." See 90 F. 3d, at 1044. In allowing Chapter 13 debtors to retain and use collateral over the objection of secured creditors, however, the Code has reshaped debtor and creditor rights in marked departure from state law. See, *e. g.*, Uniform Commercial Code §§ 9–504, 9–505, 3B U. L. A. 127, 352 (1992). The Code's cram down option displaces a secured creditor's state-law right to obtain immediate foreclosure upon a debtor's default. That change, ordered by federal law, is attended by a direction that courts look to the "proposed disposition or use" of the collateral in determining its value. It no more disrupts state law to make "disposition or use" the guide for valuation than to authorize the rearrangement of rights the cram down power entails.

Nor are we persuaded that the split-the-difference approach adopted by the Seventh Circuit provides the appropriate solution. See *In re Hoskins*, 102 F. 3d, at 316. Whatever the attractiveness of a standard that picks the midpoint between foreclosure and replacement values, there is no warrant for it in the Code.[5] Section 506(a) calls for the value the property possesses in light of the "disposition or use" in fact "proposed," not the various dispositions or uses that might have been proposed. Cf. *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531, 540 (1994) (court-made rule defining, for purposes of Code's fraudulent transfer provi-

Senate version of the bill, compare H. R. 8200, 95th Cong., 1st Sess., § 506(a) (1977), with S. 2266, 95th Cong., 1st Sess., § 506(a) (1977), and was included in the final text of the statute after the House-Senate conference, see 124 Cong. Rec. 33997 (1978).

[5] As our reading of § 506(a) makes plain, we also reject a ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases. Cf. *In re Valenti*, 105 F. 3d 55, 62–63 (CA2 1997) (permissible for bankruptcy courts to determine valuation standard case-by-case).

sion, "reasonably equivalent value" to mean 70% of fair market value "represent[s] [a] policy determinatio[n] that the Bankruptcy Code gives us no apparent authority to make"). The Seventh Circuit rested on the "economics of the situation," *In re Hoskins*, 102 F. 3d, at 316, only after concluding that the statute suggests no particular valuation method. We agree with the Seventh Circuit that "a simple rule of valuation is needed" to serve the interests of predictability and uniformity. *Id.*, at 314. We conclude, however, that § 506(a) supplies a governing instruction less complex than the Seventh Circuit's "make two valuations, then split the difference" formulation.

In sum, under § 506(a), the value of property retained because the debtor has exercised the § 1325(a)(5)(B) "cram down" option is the cost the debtor would incur to obtain a like asset for the same "proposed . . . use."[6]

\*　　\*　　\*

For the foregoing reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[6] Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property. We note, however, that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary: A creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning. Cf. 90 F. 3d, at 1051–1052. Nor should the creditor gain from modifications to the property—*e. g.*, the addition of accessories to a vehicle—to which a creditor's lien would not extend under state law.

966

[black rectangle]

JUSTICE STEVENS, dissenting.

Although the meaning of 11 U. S. C. § 506(a) is not entirely clear, I think its text points to foreclosure as the proper method of valuation in this case. The first sentence in § 506(a) tells courts to determine the value of the *"creditor's interest in the estate's interest"* in the property. 11 U. S. C. § 506(a) (emphasis added). This language suggests that the value should be determined from the creditor's perspective, *i. e.*, what the collateral is worth, on the open market, in the creditor's hands, rather than in the hands of another party.

The second sentence explains that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." *Ibid.* In this context, the "purpose of the valuation" is determined by 11 U. S. C. § 1325(a)(5)(B). Commonly known as the Bankruptcy Code's "cram down" provision, this section authorizes the debtor to keep secured property over the creditor's objections in a Chapter 13 reorganization, but, if he elects to do so, directs the debtor to pay the creditor the "value" of the secured claim. The "purpose" of this provision, and hence of the valuation under § 506(a), is to put the creditor in the same shoes as if he were able to exercise his lien and foreclose.*

---

*The Court states that "surrender and retention are not equivalent acts" from the creditor's perspective because he does not receive the property and is exposed to the risk of default and deterioration. *Ante,* at 962. I disagree. That the creditor does not receive the property is irrelevant because, as § 1325(a)(5)(B)(ii) directs, he receives the present value of his security interest. Present value includes both the underlying value and the time value of that interest. The time-value component similarly vitiates the risk concern. Higher risk uses of money must pay a higher premium to offset the same opportunity cost. In this case, for instance, the creditor was receiving nine percent interest, see *In re Rash*, 90 F. 3d 1036, 1039 (CA5 1996) (en banc), well over the prevailing rate for an essentially risk-free loan, such as a United States Treasury Bond. Finally, the concern with deterioration is addressed by another provision of the Code, 11 U. S. C. § 361, which authorizes the creditor to demand "adequate protec-

It is crucial to keep in mind that § 506(a) is a provision that applies *throughout* the various chapters of the Bankruptcy Code; it is, in other words, a "utility" provision that operates in many different contexts. Even if the words "proposed disposition or use" did not gain special meaning in the cram down context, this would not render them surplusage because they have operational significance in their many other Code applications. In this context, I also think the foreclosure standard best comports with economic reality. Allowing any more than the foreclosure value simply grants a general windfall to undersecured creditors at the expense of unsecured creditors. Cf. *In re Hoskins*, 102 F. 3d 311, 320 (CA7 1996) (Easterbrook, J., concurring in judgment). As Judge Easterbrook explained in rejecting the split-the-difference approach as a general rule, see *id.*, at 318–320, a foreclosure-value standard is also consistent with the larger statutory scheme by keeping the respective recoveries of secured and unsecured creditors the same throughout the various bankruptcy chapters.

Accordingly, I respectfully dissent.

---

tion," including increased payments, to offset any derogation of his security interest during a cram down.