NOT FOR PUBLICATION          OCT 20 2014

## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No. NV-13-1559-PaJuHl |
| ) | |
| STEPHEN W. BRAUN and LINDA M. ) | Bankr. No. 12-50386 |
| BRAUN, ) | |
| ) | |
| Debtors. ) | |
| _____) | |
| ) | |
| STEVEN W. BRAUN; LINDA M. ) | |
| BRAUN, ) | |
| ) | |
| Appellants, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[1] |
| ) | |
| NEVADA STATE BANK, ) | |
| ) | |
| Appellee. ) | |
| _____) | |

Argued and Submitted on September 18, 2014
at Las Vegas, Nevada

Filed - October 20, 2014

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Bruce T. Beesley, Bankruptcy Judge, Presiding

———————————

Appearances:    Kevin Darby for appellants; John D. Tennert of
Lionel Sawyer & Collins for appellee.

———————————

Before: PAPPAS, JURY and HOULE,[2] Bankruptcy Judges.

———————————

[1]  This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[2]  The Honorable Mark D. Houle, Bankruptcy Judge for the Central District of California, sitting by designation.

Chapter 11[3] debtors Steven W. Braun ("Braun") and Linda M. Braun (together, "Debtors") appeal the order of the bankruptcy court valuing certain real property in connection with determining the amount of a creditor's deficiency claim. We AFFIRM.

**FACTS**

**Background**

Braun is a contractor in California, and Debtors are investors in real estate. At the time of their chapter 11 bankruptcy filing on February 26, 2012, Debtors held interests in twenty-nine properties, including the one at issue in this appeal, the Regency Apartments/Motel (the "Property"), a fifty-four unit motel/apartment complex.

Debtors purchased the Property on April 25, 2008, with a loan from Nevada State Bank ("NSB") in the original amount of $1,190,000, evidenced by a Promissory Note and secured by a first priority deed of trust on the Property.[4] The balance due on the loan on the petition date was $1,115,900.40.

Debtors operated the Property as a weekly motel/apartment business. Debtors defaulted on the loan by failing to make payments to NSB in September 2011 and thereafter. At that time,

---

[3] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all Civil Rule references are to the Federal Rules of Civil Procedure 1–86.

[4] To be precise, Debtors acquired the Property in their capacity as Trustees of the Chrissani Revocable Family Trust Dated September 10, 1990. Debtors executed personal guarantees of the NSB loan. Debtors later represented to the bankruptcy court that the Chrissani Trust had been, or would be, revoked as of the bankruptcy petition date.

-2-

approximately twenty-four of the fifty-four units on the Property were occupied, a 44 percent occupancy rate.

After filing the petition, Debtors obtained permission from NSB to continue to operate and manage the Property and to use NSB's cash collateral generated by the Property for that purpose. However, by August 1, 2012, there were no tenants left at the Property; Braun testified that he "closed it, locked all the doors" and delivered the keys to the Property to a paralegal in his attorney's office. Hr'g Tr. 78:10-13, September 26, 2013. Anticipating that the Property would be of no use to them in their reorganization, Debtors filed a motion to abandon the Property on July 18, 2012. Without objection, the bankruptcy court granted the abandonment motion in an order entered on September 24, 2012, which order also terminated the automatic stay to allow NSB to enforce its rights as to the Property.

On September 26, 2012, NSB filed a complaint and application for appointment of a receiver in Nevada state court. Debtors did not oppose the receiver appointment, which occurred on October 15, 2012, and the state court directed the receiver to take possession of the Property.

On February 19, 2013, a trustee's sale of the Property was conducted pursuant to the deed of trust securing the NSB loan. Prior to the sale, NSB had engaged Reese Perkins ("Perkins"), to prepare an appraisal of the Property. Perkins completed the appraisal and opined that, as of the sale date, the market value of the Property was $460,000 "as is," and its "disposition value" was $370,000. NSB purchased the Property at the sale for

-3-

$400,678.88.[5] After the sale, NSB advertised the Property for sale on its website and, on April 15, 2013, sold it to an unrelated party for $425,000.

## Treatment of NSB's Deficiency Claim

Debtors filed a proposed disclosure statement and plan of reorganization in the chapter 11 case on July 18, 2012. They classified NSB's claim relating to the Property as a secured claim; the plan proposed to satisfy that claim in full by surrender of the collateral (i.e., the Property) to NSB.

Following the trustee's sale, NSB filed an amended proof of claim, asserting an unsecured deficiency claim for $833,601.60. Debtors filed an amendment to their plan on February 21, 2013, disputing NSB's deficiency claim, and demanding that NSB obtain a deficiency judgment in state court.

The bankruptcy court set an evidentiary hearing on valuation of the Property to settle the dispute about the amount of NSB's deficiency claim for treatment in Debtors' proposed plan. The hearing occurred on September 26, 2013, at which the court heard testimony from Braun, Debtors' appraiser Anthony Wren ("Wren"), and Perkins. The court was also given the written appraisal reports of Wren and Perkins, together with other appraisal reports from NSB's prior appraiser, James Urmiston ("Urmiston"), prepared before the foreclosure sale.[6] Urmiston did not testify, and his

---

[5] The NSB bid was based on the Perkins appraisal of the Property ($460,000), less six percent selling expenses ($27,600), past due real estate taxes ($20,124.09), a transfer tax ($2,346), and miscellaneous expenses ($9,251.03).

[6] NSB also informed the bankruptcy court in a prehearing
continue...

-4-

three appraisals were incorporated in a declaration of Debtors' counsel submitted on September 20, 2013.

The first Urmiston appraisal, with an effective date of April 20, 2010, indicated that the Property had a "stabilized value"[7] of $1,300,000, and an as-is value of $1,242,000; fourteen of the fifty-four units, or 26.9 percent, were rented at the time. The second Urmiston appraisal, with an effective date of January 26, 2011, indicated a stabilized value of $1,250,000, and an as-is value of $1,125,000, with occupancy at thirteen of fifty-four, or 24.1 percent. The third Urmiston appraisal, with an effective date of February 9, 2012, was $1,250,000 as the stabilized value, and an as-is value of $1,080,000; occupancy was twenty-four of fifty-four units, or 44.4 percent.

Perkins testified regarding the fair market value of the Property. He described how he had physically inspected the Property on December 4, 2012, February 12, 2013, and February 19, 2013. Perkins characterized the Property as "generally in fair to poor condition," observing "extensive signs of deferred maintenance," that the "asphalt paving areas were in very poor condition," and that the roof suffered "substantial damage" caused by water. Hr'g Tr. 10:15-25, September 26, 2013. Perkins concluded that the "highest and best use of the [Property] was for

[6] ...continue
statement that it had received three written letters expressing an interest in purchasing the Property for $300,000, $412,000 and $500,000, respectively, but none of those letters led to a formal purchase offer.

[7] All of the appraisals in this appeal consider an occupancy rate of approximately 80 percent as a stabilized occupancy rate for motels/apartments in the area of the Property.

redevelopment . . . at such time as market conditions indicate." Having determined that the value of the Property without tenants would be greater than the value of the Property with tenants, Perkins concluded that the fair market value on the date of the foreclosure sale was $460,000.

Wren also testified as to the fair market value of the Property. He inspected the Property initially on August 27, 2013, and several times thereafter. Wren confirmed in his testimony that he had no personal knowledge of the condition of the Property on December 4, 2012, or February 19, 2013 (the dates of the Perkins's inspection and the foreclosure sale).

Wren's appraised market value for the Property was $1,000,000. By its terms, however, Wren's appraisal, prepared on September 18, 2013, was "retroactive" to December 4, 2012. Further, Wren's appraisal was apparently based on an incorrect assumption that the Property had achieved stabilized occupancy on December 4, 2012:

> TENNERT [NSB Counsel]: So your appraised value is based on the assumption that this property were to be stabilized as of December 2012; is that correct? . . .
>
> WREN: Yes.
>
> TENNERT: But in fact, that's incorrect. The property was 100 percent vacant in December of 2012; is that correct?
>
> WREN: According to Mr. Perkins['s] report, yes. . . .
>
> TENNERT: Do you have any reason to believe that the property was not vacant in December of 2012?
>
> WREN: None, whatsoever.

Hr'g Tr. 59:9-20.

Wren further testified that a week before the hearing he

-6-

consulted loopnet.com, a commercial real estate listing service on which the Property was listed for "I think it was 690,000, 660,000, 600 and some thousand." Hr'g Tr. 48:2.

Braun testified concerning his opinion of the value of the Property as of August 2012. Braun stated, "I default to . . . Urmiston's appraisal. He had at a million something." Hr'g Tr. 69:7-8. In response to his lawyer's leading questions, Braun indicated that he was referring to Urmiston's third appraisal of February 9, 2012. Hr'g Tr. 69:13-15. At the conclusion of Braun's testimony, the bankruptcy court admonished Debtors' counsel: "You might want to have a short discussion with your client and tell him to answer questions and not volunteer things. He's making himself to be not credible at all, so I'm having difficulty believing what he's saying given his approach to answering questions." Hr'g Tr. 81:14-18.

The next day, on September 27, 2013, the bankruptcy court orally announced its findings and conclusions, determining that the fair market value of the Property was $650,000. On November 7, 2013, the court filed "Findings of Fact and Conclusions of Law Regarding the Fair Market Value of the Regency Motel/Apartments" and an Order.

In its decision, although the bankruptcy court found Perkins testimony and appraisal credible, it disagreed with Perkins's determination that the highest and best use for the Property was redevelopment. Based in part on Perkins's testimony and appraisal, the court noted that there were several similar motels/apartments within two to three miles of the Property that were apparently functioning successfully as weekly rentals. The

-7-

court also disagreed with Wren's opinion of value of $1,000,000 because Wren's valuation was partly based on an incorrect assumption that the Property was stabilized as of the date of his retroactive valuation. Finally, the court noted the testimony of Wren that the Property was currently listed, and that Wren thought the price was approximately $650,000. The court concluded:

> Based on the foregoing and consideration of the testimony of the appraisers, the testimony of Mr. Braun, photos of the Property, comparable properties represented in the appraisals, and this Court's personal knowledge of the Property and the area, the Court finds that on both September 24, 2012, the date the Court entered the Order abandoning the Property from the estate, and on February 19, 2013, the date of the trustee's sale, the fair market value of the Property was $650,000.

Debtors filed a timely appeal of the bankruptcy court's order.[8]

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B), (L) and (O). The Panel has jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court clearly erred in determining the fair market value of the Property.

## STANDARD OF REVIEW

Fair market value is a finding of fact reviewed for clear error. Arnold & Baker Farms v. United States (In re Arnold &

---

[8] A confirmation hearing was held and Debtors' proposed plan was confirmed on April 30, 2014. The confirmed plan valued the Property at $650,000 per the bankruptcy court's valuation order. NSB expressly preserved its objection to confirmation of the plan based on the valuation issue and certain other arguments not relevant in this appeal.

-8-

Baker Farms), 85 F.3d 1415, 1421 (9th Cir. 1996); accord, McCarran Int'l Airport v. Sisolak, 137 P.3d 1110, 1128 (Nev. 2006). In reviewing the bankruptcy court's determination of fair market value, we apply the substantive law of the state and the federal standard of review for a finding of fact. Felder v. United States, 543 F.2d 657, 664 (9th Cir. 1976) ("We believe that the federal standard should apply in the review of a finding of fact made in a non-jury trial by a federal court applying state law."). A bankruptcy court's valuation of a Nevada property involving assessment of competing expert witnesses is a finding of fact reviewed for clear error. State Street Bank v. Elmwood, Inc. (In re Elmwood, Inc.), 182 B.R. 845, 850 (D. Nev. 1995).

A finding of fact is clearly erroneous only if it is "illogical, implausible, or without support in inferences that may be drawn from the record." United States v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).[9]

**DISCUSSION**

Under § 506(a),[10] NSB held both a secured and unsecured claim

_____

[9] As noted here, we apply the federal standard of review. However, in this case, there is no difference between the standard applied by a federal court and that of the Nevada Supreme Court. Valuation of property in Nevada courts is reviewed for clear error, that is, whether the court's judgment is supported by "substantial evidence." Fick v. Fick, 851 P.2d 445, 463 (Nev. 1993). The Nevada Supreme Court has held that a court's determination of property value by setting a figure between two expert appraisals satisfies the substantial evidence requirement and is not clearly erroneous. Halfon v. Title Ins. & Trust Co., 634 P.2d 660, 661 (Nev. 1981).

[10] Section 506(a)(1) provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a

continue...

-9-

when the bankruptcy case was commenced. As the Supreme Court has explained, via this Code provision, in bankruptcy, a creditor's claim is divided (i.e., bifurcated) into "secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral."  Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 961 (1997); see also, In re Enewally, 368 F.3d at 1168-69 ("Under the Bankruptcy Code, a secured loan may be separated into two distinct claims: a secured claim for an amount equal to the value of the security, and an unsecured claim for the difference, if any, between the amount of the loan and the value of the security.").  Rule 3012[11] empowered the bankruptcy court to determine the amount of NSB's secured and unsecured claims for purposes of the bankruptcy case.

As events unfolded, however, the secured portion of the NSB claim in Debtors' case was satisfied when Debtors' interest in the Property was abandoned and NSB foreclosed under the deed of trust. While NSB acquired the Property for a credit bid of approximately

[10]...continue
secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

§ 506(a)(1); see Enewally v. Wash. Mut. Bank (In re Enewally), 368 F.3d 1165, 1168 (9th Cir. 2004)

[11]  Rule 3012 provides:

**Valuation of Security.**

The [bankruptcy] court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct.

-10-

$400,000 at the sale, the amount of its unsecured deficiency claim against Debtors is determined by state law. Wells Fargo Fin. Acceptance v. Rodriquez (In re Rodriquez), 375 B.R. 535, 545 (9th Cir. BAP 2007).

Here, Nevada statutes govern the determination of the amount of a creditor's deficiency claim after foreclosure. Nev. Rev. Stat. ("NRS") § 40.455 provides that a creditor may recover a deficiency judgment if, after a foreclosure sale, "there is a deficiency of the proceeds of the sale and a balance remaining due to the judgment creditor or the beneficiary of the deed of trust, respectively." However, regardless of the foreclosure sale price, NRS § 459 limits that deficiency judgment "to the amount by which the debt exceeds the greater of the fair market value of the security on the date of the foreclosure sale or the amount bid at such sale by the creditor." And NRS § 40.457 provides that the court shall "hold a hearing and take evidence presented by either party concerning the fair market value of the property sold as of the date of foreclosure sale or trustee's sale."

Under Nevada law, fair market value is "the price which a purchaser, willing but not obliged to buy, would pay an owner willing but not obliged to sell, taking into consideration all the uses to which the property is adapted and might in reason be applied." Unruh v. Streight, 615 P.2d. 247, 249 (Nev. 1980). Fair market value is determined by reference to "the highest and best use for which the land is available and for which it is plainly adaptable." Cnty. of Clark v. Sun State Props., 72 P.3d 954, 958 (Nev. 2003). The highest and best use must be "reasonably probable." Cnty. of Clark v. Alper, 685 P.2d 943, 946 (Nev.

1984). In determining fair market value, the trier of fact may consider "any elements that fairly enter into the question of value which a reasonable businessman would consider when purchasing." McCarran Int'l Airport, 137 P.3d at 1128; City of Las Vegas v. Bustos, 75 P.3d 351, 352 (Nev. 2003). In valuing property, a court may "in the exercise of its discretion, properly consider the experts' testimony relative to the highest and best use, along with the rest of the evidence, in determining the fair market value of the property." Tahoe Highlander v. Westside Fed. Sav. & Loan Ass'n, 588 P.2d 1022, 1024 (Nev. 1979). To the extent that a creditor asserts a deficiency as an unsecured claim in the bankruptcy case, the bankruptcy court has exclusive jurisdiction over the determination and allowance of that claim. Pierce v. Carson (In re Rader), 488 B.R. 406, 413 (9th Cir. BAP 2013). Here, the bankruptcy court determined that, for purposes of fixing the amount of NSB's deficiency claim in Debtors' bankruptcy case, the fair market value of the Property was $650,000 as of the date of the foreclosure sale based upon its evaluation of the evidence, including the competing valuations made by the parties's experts.

The bankruptcy court's finding was not clearly erroneous.

**A. The Valuation Date.** In Nevada, to establish the amount of a deficiency after foreclosure, the fair market value of the security is "determined on the date of foreclosure." Unruh, 615 P.2d at 248. In this case, the foreclosure sale occurred on February 19, 2013.

The bankruptcy court seemingly used a different valuation date in making its decision: "September 24, 2012, is the relevant date for establishing the value of the Property, which is the date

-12-

the Property was abandoned and surrendered by the Estate to NSB." Finding of Fact 21. However, to the extent it used an incorrect valuation date, we conclude the error made by the bankruptcy court was harmless because the court also found that "on both September 24, 2012, the date the Court entered the Order abandoning the Property from the estate, and on February 19, 2013, the date of the trustee's sale, the fair market value of the Property was $650,000." Finding of Fact 18. This finding was consistent with its oral findings announced at the September 27, 2013, hearing: "I don't think that value changed from the time of the abandonment 'til the time of the foreclosure, and that's my finding." Hr'g Tr. 7:16-19, September 27, 2013.

**B. The bankruptcy court evaluated the competing expert testimonies and other value evidence**. The bankruptcy court appears to have carefully considered all of the valuation evidence, and to have appropriately weighed the expert opinions offered by the parties, in reaching its final valuation decision. We conclude that the bankruptcy court did not err in this process.

The bankruptcy court considered the testimony of NSB's expert, Perkins, that the market value of the Property on the valuation date was $460,000 if that value was determined exclusive of improvements, for redevelopment purposes. In contrast, Wren, Debtors' expert, testified that the value was $1,000,000 as a motel/apartment enterprise. The bankruptcy court disagreed with both experts. Although acknowledging that Perkins was credible, the court found that, based on Perkins's own testimony, similar buildings in the area were successfully operating, and therefore the best and highest use of the Property was as a continuing

-13-

motel/apartment enterprise.[12] In addition, the court appears to have discounted Wren's $1,000,000 valuation, because it was based on an inaccurate assumption that the Property was stabilized on the date of his valuation and, in addition, was calculated retroactively, seven months after the valuation date.

The bankruptcy court also appears to have discounted the three Urmiston appraisals. This was not erroneous, because under Nevada law, a court should disregard appraisals performed before the foreclosure date. Lee v. Verex Assur., Inc., 746 P.2d 140, 143 (Nev. 1987). The court also did not endorse Braun's valuation, which Braun admitted was based on the Urmiston third appraisal. The bankruptcy court also expressed concern for the credibility of Braun.

Debtors argue that the bankruptcy court committed reversible error when it failed to accept one or the other of the experts' opinions of value and, instead "created its own value out of thin air." Debtors' Op. Br. at 9. But Debtors' argument is flatly contrary to applicable law. In Nevada, where the trial court determines that the fair market value "falls within the range of prices set forth by the appraisers, the court's factual determination of value should not be disturbed." Tahoe Highlander, 588 P.2d at 1024. A trial court is not bound to accept any particular expert's value testimony, nor is it bound by the formulas and opinions proffered by experts; it may accept or

---

[12] Although the parties do not discuss it, Perkins actually provided two valuations, one of $460,000 for redevelopment, and one of $450,000 as a continuing motel/apartment enterprise. He recommended the $460,000 valuation because it was the "highest and best use" of the Property.

-14-

reject expert testimony in whole or in part in the exercise of its sound judgment. Allen v. State, 665 P.2d 238, 240 (Nev. 1983) ("[e]xpert testimony is not binding on the trier of fact").

Here the bankruptcy court considered testimony from two qualified appraisers whose testimony effectively established a range of values for the Property as a motel/apartment continuing enterprise from $450,000 to $1,000,000. For the reasons it explained, the court selected a value of $650,000, a value within the range set by the appraisers. The court supported its valuation with references to the appraisals and other evidence. We find no clear error in the bankruptcy court's valuation.

Debtors insist that the bankruptcy court simply "split the difference" between the two expert valuations. Debtors rely on Assoc. Commercial Corp. v. Rash, 520 U.S. 953, 964 (1997), wherein the Supreme Court rejected a "judge made" rule in the Seventh Circuit that, for auto valuations, based on the "economics of the situation," and the Bankruptcy Code's apparent silence on conflicting valuations, that a bankruptcy court should simply split the difference between the wholesale and retail values. See In re Hoskins, 102 F.3d 311, 316 (7th Cir. 1996) (endorsing a midpoint value between wholesale and retail values of a car).

But the facts in this case, and the bankruptcy court's approach to valuation, are dissimilar from those examined in Rash. Here, the bankruptcy court did not decide between foreclosure and replacement value for the Property, as was the case in Rash. Instead, the bankruptcy court consulted competing appraisals, all of which focused on determining the market value of the Property. In weighing these valuation opinions, the bankruptcy court was not

-15-

required to accept any given appraisal, but was instead duty-bound to make an independent decision. Allen, 665 P.2d at 240. The court did not err when it selected a value within the range determined by the evidence.[13]

Finally, Debtors argue that the bankruptcy court's valuation was based on inadmissible testimony that the current owner of the Property had listed it for sale for a price between $600,000 and $690,000. Ironically, though, that information came from the testimony of Debtors' own appraiser Wren, in response to a leading question by Debtors' attorney, referring to Wren's understanding that the current owner had listed the Property on an internet listing agency. In recounting this information, Wren was apparently uncertain of the precise amount which the Property was being offered for sale, so he testified to approximate figures. The bankruptcy court accepted this testimony as an approximation and found that "the current owner's listing price of approximately $650,000 is further indication of the fair market value of the Property." But by referring to this information as a "further indication," the court indicated that it was not the fundamental basis for its valuation, but supporting data. It was therefore not clear error for the court to reference the listing price.

---

[13] In Hoskins, the Seventh Circuit adopted a mathematical, mechanical rule that exactly split the difference between two valuations approaches for the same vehicle. In re Hoskins, 102 F.3d at 316. Here, the bankruptcy court did not mathematically or mechanically "split the difference,"; $650,000 is not the "midpoint" between the two appraisers' value opinions.

-16-

**CONCLUSION**

The bankruptcy court decided that fair market value of the Property was $650,000 based on its careful consideration of evidence presented.  Its valuation resolved a question of fact, and its finding was not clearly erroneous.  We therefore AFFIRM the bankruptcy court's order.