## In re Robin HENDERSON and Tina Henderson, Debtors.

### Bankruptcy No. 98–84355.

United States Bankruptcy Court, C.D. Illinois.

June 17, 1999.

James S. Brannon, Peoria, Illinois, for debtors.

Thomas J. Noonan, Amy T. Tucker, St. Louis, Missouri, for Arcadia Financial Ltd.

## OPINION

WILLIAM V. ALTENBERGER, Chief Judge.

Before the Court is the motion to redeem a 1993 Chevy Corsica, pursuant to § 722 of the Bankruptcy Code, 11 U.S.C. § 722, filed by ROBIN and TINA HENDERSON, the Debtors (DEBTORS) and the objection thereto filed by ARCADIA FINANCIAL, LTD., (ARCADIA) the secured creditor. A hearing was held on April 26, 1999, to fix the value of the vehicle, and the matter was taken under advisement by the Court.

The parties dispute the appropriate standard of value to be applied by the Court. ARCADIA contends that in order to redeem the vehicle under § 722, the DEBTORS must pay the vehicle's retail value. The DEBTORS seek a valuation based upon the vehicle's loan value, asserting that ARCADIA never receives more than that amount when it repossesses and sells a vehicle. At issue is whether the Supreme Court's decision in *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), holding that where a Chapter 13 debtor proposes to retain secured collateral over the creditor's objection, the amount of the secured claim is the replacement value of the property, governs here. Looking to the definition of "secured claim" in § 506(a) of the Bankruptcy Code, 11 U.S.C. § 506(a), the Court concluded that

"the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question." Rejecting a foreclosure-value standard for property retained by Chapter 13 debtors, the Supreme Court explained:

> Tying valuation to the actual "disposition or use" of the property points away from a foreclosure-value standard when a Chapter 13 debtor, invoking cram down power, retains and uses the property. Under that option, foreclosure is averted by the debtor's choice and over the creditor's objection. From the creditor's perspective as well as the debtor's, surrender and retention are not equivalent acts.
>
> When a debtor surrenders the property, a creditor obtains it immediately, and is free to sell it and reinvest the proceeds. We recall here that [the creditor] sought that very advantage. (Citation). If a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use. Adjustments in the interest rate and secured creditor demands for more "adequate protection," 11 U.S.C. § 361, do not fully offset these risks. See [In re Rash,] 90 F.3d [1036,] 1066 (Smith, J., dissenting) ("vast majority of reorganizations fail … leaving creditors with only a fraction of the compensation due them"; where, as here, "collateral depreciates rapidly, the secured creditor may receive far less in a failed reorganization than in a prompt foreclosure") (citation).
>
> Of prime significance, the replacement-value standard accurately gauges the debtor's "use" of the property. It values "the creditor's interest in the collateral in light of the proposed [repayment plan] reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to … its [replacement] value." (Citation). The

debtor in this case elected to use the collateral to generate an income stream. That actual use, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's "disposition or use." (Citation).

In *In re Donley,* 217 B.R. 1004 (Bkrtcy. S.D.Ohio 1998), the court held that the *Rash* replacement-value did not apply to a Chapter 7 redemption. Accepting the debtors' contention that the redemption value should be measured by what the creditor would receive if it were forced to repossess and sell the collateral, the court reasoned:

> Because the debtor in the present case wishes to retain the mobile homes, *Rash* would at first glance seem to govern. Certainly, the *Rash* court's interpretation of the first sentence of § 506(a) is controlling. Were the *Rash* standard as measured by the second sentence of § 506(a) also to apply, the value of [the creditor's] secured claim would be $10,000 given the debtor's own testimony. There are reasons, however, to believe that application of the replacement value standard does not reflect the "purpose of the valuation and the proposed disposition or use of such property" in the context of redemption under chapter 7.
>
> First of all, the legislative history to § 722 supports a valuation standard different from that of replacement value. According to the House report, redemption … "amounts to a right of first refusal on a foreclosure sale of the property involved. It allows the debtor to retain his necessary property and avoid high replacement costs, and does not prevent the creditor from obtaining what he is entitled to under the terms of his contract." H.REP. No. 95–595, at 127 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5913. These comments strongly suggest that Congress, in enacting § 722 as part of the Bankruptcy Reform Act of 1978, intended to

place the creditor in the same position it would have been in had the property not been redeemed and the creditor had repossessed and caused a sale of such property. (Citation).

Prior to *Rash*, it appears to have been the opinion of the Sixth Circuit, expressed in dicta, that a debtor may redeem tangible secured personal property by paying the creditor the approximate fair market value of the property. (Citation). The Court indicated that fair market value in the context of a redemption contemplated a sale for the benefit of the creditor. (Citation). Therefore, both the legislative history to § 722 and the understanding of the Sixth Circuit before *Rash* support a standard whereby a creditor's allowed secured claim in property to be redeemed is measured by what a sale for the benefit of the creditor would bring or the amount of the creditor's claim, whichever is less.

*Rash* need not change this understanding. As the Supreme Court noted, retention and use of collateral by the debtor in a chapter 13 cramdown exposes the secured creditor to a double risk of future default by the debtor and the deterioration of the property from extended use. (Citation). In contrast, redemption involves neither of these risks. Therefore, imposition of the replacement value standard is probably inappropriate in redemption cases. *See* Mitsch & Crutchfield, "The Rash Decision: A Question of Value in Context," 16–Aug. *Am. Bank. Inst. J.* 18 (July/August 1997).

■ This Court agrees with the court's decision in *Donley*. Throughout its opinion, the Court in *Rash* confined its decision to Chapter 13 cases. Even though the DEBTORS are keeping the vehicle here, this is a Chapter 7 case and it is appropriate to look to what the creditor would receive upon liquidation of its collateral. Redemption, available only to Chapter 7 debtors, permits a debtor to keep property, avoiding the high cost of replacement while simultaneously giving the secured creditor the benefit of its bargain by requiring the debtor to pay what the creditor would have received had it fully exercised its rights by repossessing and selling the collateral. Because a creditor is paid in a lump sum upon a debtor's redemption, rather than in installments, the risks attendant to a Chapter 13 proceeding discussed by the Court in *Rash* are not present.

■ The parties also differ on the appropriate date for valuation of the vehicle. ARCADIA submits a valuation as of December 1998, the month the bankruptcy was filed. The DEBTORS submit a valuation based upon a value as of April 1999, the date of the hearing on their motion to redeem. In *In re Hayward*, Case No. 90–80993, this Court held that the proper date for valuation for redemption purposes is the date of the redemption. In so holding, this Court noted the relatively short time frame set by the Bankruptcy Code for the debtor to accomplish a redemption and recognized that a repossession and sale of the collateral by the secured creditor would naturally take some time. This Court cautioned, however, that an earlier date might be used if the creditor demonstrated undue delay, gross negligence or other acts of the debtor which had unfairly decreased the value of the collateral. The same conclusion was recently reached by the court in *In re Lopez*, 224 B.R. 439 (Bkrtcy.C.D.Cal.1998). Because none of the special circumstances delineated in *Hayward* are present here, the vehicle will be valued as of the date of the hearing on the DEBTORS' motion to redeem.

In support of their position that this Court should consider what ARCADIA would get for the Corsica if it were to repossess and sell it, the DEBTORS sought discovery from ARCADIA regarding its most recent dispositions of repossessed vehicles. ARCADIA responded that it disposed of repossessed vehicles at auction and provided certain data as to the

last twenty vehicles repossessed in Illinois. ARCADIA disclosed the make, model and year of the vehicle; the "regional" value; the sale proceeds; the date of sale; and the expenses incurred in connection with the sale. The regional value supplied by ARCADIA was based upon a nationwide computer system called VINTEK,[1] and according to ARCADIA, represents the average price a particular vehicle sells for in a particular region.

In an attempt to establish a redemption value for the Corsica, the DEBTORS seek to compare the information furnished by ARCADIA to the NADA average loan value, vehicle by vehicle. The DEBTORS' analysis fails on at least two grounds. First, the DEBTORS' use of the NADA loan value is not appropriate. It is the NADA average trade-in value which represents the average wholesale value based on auction reports and dealer wholesale reports. *See In re Thayer*, 98 B.R. 748 (Bkrtcy.W.D.Va.1989). The average loan value, being the lowest of the three values provided by the NADA guide, represents the amount of money a lending agency would loan to a purchaser of the vehicle and is not particularly pertinent to the determination of value under § 722. Secondly, the DEBTORS' analysis stops short. Because the description of the vehicles supplied by ARCADIA was minimal, the NADA loan value attributed by the DEBTORS is most often given as a range of values, varying drastically in certain instances. For instance, the DEBTORS give the loan value for a 1993 Ford Mustang as ranging from $3,000 to $8,125.00; the loan value given for a 1995 Chevrolet Camaro varies from $7,425 to $12,350. Given the flaws inherent in the basic data, any analysis is likely to multiply the inaccuracy and further impugn its reliability. Notwithstanding the fact that the DEBTORS use the wrong standard for comparison, they do not attempt to establish a

range, in terms of a percentage, from which the proceeds of the sale vary from that comparative value, but conclude only that in all but three instances, ARCADIA received less that the NADA loan values for the vehicles, without accounting for the expenses of sale. Though the DEBTORS were headed in the right direction, the data as supplied offers no basis to fix a redemption value for the 1993 Chevy Corsica. In so concluding, this Court notes that the sample of twenty sales may be too small for a reliable analysis. In this Court's view, several of the sales must be disregarded as atypical, and others involve vehicles which are not similar to that owned by the DEBTORS.

Absent such evidence, and based upon the fact that ARCADIA sells all of its repossessed vehicles at auction, this Court will use the NADA trade-in value for a like vehicle, closest to the date of the hearing, which is $3,325, as a starting point. Based upon the DEBTORS' testimony as to the general condition and costs to repair the vehicle, that value will be reduced by $300. A deduction for high mileage is also made in the amount of $225. Accordingly, this Court finds that the value of the Corsica to be $2,800.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

---

**1.** This Court is not familiar with that system. In all prior cases, the Court has accepted the National Automobile Dealer Association (NADA) Official Used Car Guide, as a reliable and authoritative source for average retail and wholesale values for vehicles at valuation hearings.