**In re Joann SMITH, Debtor.**

No. 03 B 35345.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 1, 2004.

Sara K. Ledford; Xiaoming Wu, for Debtor.

David P. Leibowitz, Esq., Waukegan, IL, trustee.

## MEMORANDUM OPINION ON DEBTOR'S MOTION TO REDEEM

JACK B. SCHMETTERER,
Bankruptcy Judge.

The Debtor, Ms. Joann Smith ("Smith"), in this Chapter 7 proceeding proposes to redeem her automobile pursuant to 11 U.S.C. § 722 based on its wholesale value. The main issue presented is whether a wholesale value standard or a retail value standard should be used to determine the amount of a secured claim for redemption purposes. For reasons discussed below, the automobile must be valued under 11 U.S.C. § 506(a) according to its retail value discounted to eliminate inapplicable elements of that value, not wholesale value. Moreover, the showing as to purported wholesale value is not proper and must be rejected, though a proper showing could be made under Evidence Rule 803(17). For both reasons, the motion is by separate order denied.

### INTRODUCTION

■ Smith filed a petition for relief under Chapter 7 of the Bankruptcy Code on December 29, 2003. She claimed an exemption for a 2000 Plymouth Neon used for ordinary household purposes. The exemption was not contested. Household Automotive Finance Corp. ("Household") holds a valid and enforceable security interest in the vehicle. Smith seeks to redeem the vehicle based on its "wholesale" value of $3,650.00, a figure supposedly calculated by the 2004 Valuation Report of the National Automobile Dealers Association ("NADA"). If it were actually pre-sented, that Report would be admitted into evidence under Rule 803(17) Federal Rules of Evidence. Since creditors in Chapter 13 cases generally lack assets to enable them to employ experts to testify, and since the auto loan creditors rarely elect to present expert testimony (never in this Court), some type of recognized valuation source is generally the only evidence presented. That is why one of the recognized commercial and auto industry valuation sources is usually offered under Rule 803(17).

However, that Rule was not satisfied by Debtor. Her counsel did not tender a NADA report but rather offered a "Vehicle Condition Report" by the "Collateral Valuation Services LLC," in Cincinnati, Ohio, an entity that evidently values cars and makes new loans on those vehicles to pay for redemption. Its "Report" in this case showed the vehicle "based on NADA Central Region" at a "wholesale" value of $3,650. However, the actual NADA Central Region publication values vehicles at "Trade–In," "Loan," and "Retail," not "wholesale." This is a good illustration of the reason why the evidence Rules generally block hearsay which is exactly what the "Vehicle Condition Report" consists of. It is not admissible, and no other evidence was offered, so the motion must be denied for this reason alone.

Household did not appear in response to the redemption motion. Because the issue as to valuation standard repeatedly arises and lawyers practicing in bankruptcy would rely on a ruling here even if not contested, the Court invited amicus briefs, and two parties were allowed to intervene and file such briefs.

### JURISDICTION

Jurisdiction lies here under 28 U.S.C. § 1334, and the case is referred by the

District Court under Internal Operating Procedure 15(a). Determination of the validity, extent, or priority of a lien is a core proceeding under 28 U.S.C. § 157(b)(2)(K), and the adjustment of the debtor-creditor relationship is a core proceeding under 28 U.S.C. § 157(b)(2)(O). Venue lies here under 28 U.S.C. § 1409(a).

## DISCUSSION

Title 11 U.S.C. § 722 grants debtors the right to redeem specified collateral by paying their creditors the amount of the "allowed secured claim:"

> An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien.

Section 722 does not expressly set out a valuation standard, but does refer to payment of a creditor's "allowed secured claim," and that is determined under 11 U.S.C. § 506(a):

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to a setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the*

*valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.* (Emphasis provided.)

### The Rash Decision

■ The Supreme Court in *Associates Commercial Corporation v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) (Stevens, J., dissenting) held that § 506(a) requires a replacement valuation standard. The opinion in *Rash* defined replacement value as "the price a willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller," *Id.* at 960, 117 S.Ct. 1879.

In *Rash,* the debtor's Chapter 13 bankruptcy plan proposed to "cramdown" collateral and pay the creditor an amount based on the collateral's foreclosure value. The creditor objected, asserting that the collateral should be valued under § 506(a) according to its replacement value. *Rash,* 520 U.S. at 961, 117 S.Ct. 1879.

The *Rash* opinion parsed § 506(a) in language dealing with the meaning of words in that provision. The first full sentence of § 506(a) referenced the need to determine what ownership interest was held by a debtor and creditor in the subject property, but was found not to determine how to value collateral.

The opinion went on to discuss the second sentence of § 506(a):

> The second sentence of § 506(a) does speak to the *how* question. "Such value," that sentence provides, "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." § 506(a). By deriving a foreclosure-value standard from § 506(a)'s first sentence, the Fifth Circuit rendered inconsequential the

sentence that expressly addresses how "value shall be determined."

As we comprehend § 506(a), the "proposed disposition or use" of the collateral is of paramount importance to the valuation question.

*Id., Rash,* 520 U.S. at 961–62, 117 S.Ct. 1879.

The second sentence of § 506 was found to create a "prescription hinged to the property's disposition or use," *Id.* at 963, 117 S.Ct. 1879, that is use by the debtor. It cannot be doubted here that debtor's proposed use of the auto is for ordinary household purposes, since that is what § 722 requires. *Rash* concluded that a replacement standard accurately gauges the debtor's retention of the property in a Chapter 13 cramdown hearing and protects the creditor against the double risks of future plan default and collateral depreciation. *Rash* rejected a foreclosure value standard, in part, because debtors retain collateral when they exercise the cramdown option, thereby averting the costs of foreclosure. *Id.* at 961, 117 S.Ct. 1879. But other language in the opinion made clear that while the rationale of the ruling applied to the Chapter 13 cramdown proposed in *Rash*, the ruling itself clearly rejected any different valuation standard pertaining to § 506(a) under different circumstances:

> n5 As our reading of § 506(a) makes plain, we also reject a ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases. Cf. *In re Valenti,* 105 F.3d 55, 62–63 (C.A.2 1997) (permissible for bankruptcy courts to determine valuation standard case-by-case).

*Rash, Id.,* at 964, 117 S.Ct. 1879, fn5.

*Rash* did give some important guidance, that in determining "[w]hether replacement value is the equivalent of retail value,

wholesale value, or some other value will depend on the type of debtor and the nature of the property," and adjustments downward were mandated in the valuation analysis:

> n6 Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property. We note, however, that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary: A creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning. Cf. [*In re Rash,*] 90 F.3d [1036] at 1051–1052 [(5th Cir.1996)]. Nor should the creditor gain from modifications to the property—*e.g.,* the addition of accessories to a vehicle—to which a creditor's lien would not extend under state law.

*Rash,* 520 U.S. at 964 n. 6, 117 S.Ct. 1879 (Emphasis supplied.)

### The Implications of Rash to Chapter 7 Redemptions

The issue here is whether *Rash's* replacement value standard applies in the context of a Chapter 7 redemption. Other opinions have adopted a foreclosure value standard and generally follow the reasoning of *In re Donley,* 217 B.R. 1004 (Bankr. S.D.Ohio) and *Triad Financial Corpora-*

*tion v. Weathington (In re Weathington)*, 254 B.R. 895 (6th Cir. BAP 2000). *See, e.g. In re Tripplett*, 256 B.R. 594 (Bankr. N.D.Ill.2000) (Wedoff, J.); and *In re Henderson*, 235 B.R. 425 (Bankr.C.D.Ill. 1999). Indeed, in addition to those decisions, every authority considering the issue has declined to apply *Rash* to redemptions in Chapter 7, limiting *Rash's* analysis and valuation standard to Chapter 13 cramdowns.[1] The Debtor here contends that those cases were correctly reasoned and a foreclosure standard of valuation is therefore appropriate, which is said to be analogous to the "wholesale" value offered.

When all prior opinions by experienced and astute judges come to one conclusion, a judge who dissents has a heavy burden to respect earlier views and follow them for reasons of consistency unless powerful reasons show them wrong and respect for the judicial process mandates a different view. That is the case here, and this opinion follows the instructive and authoritative ruling by the U.S. Supreme Court even though personal feelings would be more comfortable with a different result.

### Valuation Terminology

It must first be noted that the parties and opinions use a variety of terms to refer to the possible valuation standards. Smith uses the term "wholesale" value. The seminal case rejecting replacement value, *Weathington*, used "wholesale value" and "liquidation value" interchangeably, defining both as the amount the creditor would receive if the creditor repossessed and sold the collateral in the manner most beneficial to the creditor. *Weathington*, 254 B.R. at 899 n1. *Rash* referred to "foreclosure value" (which the opinion rejected) as the amount a creditor realizes upon foreclosure and sale of collateral, analogous to liquidation or wholesale value.

*Rash's* reference to "replacement value" is often referred to as "retail value," because its definition of replacement value, "the price a willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller" certainly appears to incorporate elements of retail value that a debtor would have to pay on the open market. *Rash*, 520 U.S. at 960, 117 S.Ct. 1879. *See also In re Hoskins*, 102 F.3d 311 (7th Cir.1996) (citing *In re Ebbler Furniture & Appliances, Inc.*, 804 F.2d 87, 92 (7th Cir.1986)) (concurring opinion). That definition applies to this Debtor who in absence of redemption would have to replace the subject vehicle on the open retail used car market if she wants it for household use, there being no evidence offered that she has access to the wholesale market.

The definitional confusion is enhanced by frequent use of the phrase "trade-in value." The Kelley Blue Book (Kelley Blue Book: Used Car Guide 3–4 (2004)) defines "trade-in value" as the amount a consumer might expect a dealer to offer when asking the dealer to take a vehicle in trade, and includes factors such as costs to

1. *In re Barse*, 301 B.R. 404 (Bankr.W.D.N.Y. 2003) gave seven reasons for using the *Rash* standard in Chapter 7, but deferred to the contrary decisions in all reported cases. *See In re Murray*, No. 00–10603C–7G, 2000 WL 33673802, 2003 U.S. Dist. LEXIS 22483 (Bankr.M.D.N.C. June 23, 2000); *In re Funk*, No. 02–51304 7, 2002 WL 31051035 (Bankr. M.D.N.C. Sept.5, 2002); *Zell v. Chevy Chase Bank, FSB (In re Zell)*, 284 B.R. 569 (Bankr. D.Md.2002); *In re Ballard*, 258 B.R. 707 (Bankr.W.D.Tenn.2001); *In re Dunbar*, 234 B.R. 895 (Bankr.E.D.Tenn.1999); *In re Williams*, 224 B.R. 873 (Bankr.S.D.Ohio 1998); *In re Tripplett*, 256 B.R. 594 (Bankr. N.D.Ill.2000); *In re Henderson*, 235 B.R. 425 (Bankr.C.D.Ill.1999); *In re Podnar*, 307 B.R. 667, 2003 WL 23350227 (Bankr.W.D.Mo. 2003); *In re Ard*, 280 B.R. 910 (Bankr. S.D.Ala.2002); *In re Dobler*, No. 02–30016, 2002 WL 31342412 (Bankr.D.N.D. June 20, 2002).

recondition and repair vehicles purchased from consumers, interest incurred by the dealer to finance the vehicle, operational costs of the dealership, and the dealer's anticipated profit. Since no trade-in is involved here or in the usual case, that standard will rarely if ever be applicable.

There are several recognized valuation sources other than NADA that may be admitted and considered under Rule 803(17) Federal Rules of Evidence, *In re Roberts*, 210 B.R. 325, 330–1 (Bankr. N.D.Iowa 1997), but those sources present diverse approaches to defining value.[2]

For the sake of consistency, this Opinion will use the terms "liquidation value" according to its definition in *Weathington* and "replacement value" according to its definition in *Rash*, analogous to "wholesale" and "retail" values respectively as defined in the commonly used valuation guide books.

### Economic Consequences Argument

The main rationale for rejecting replacement value in Chapter 7 cases is that the ruling in *Rash* followed discussion there about risks imposed by Chapter 13 cramdowns upon creditors, namely collateral depreciation and plan default, *Rash*, 520 U.S. at 964, 117 S.Ct. 1879. It is argued that the *Rash* rationale in a Chapter 13 cramdown case does not apply to a Chapter 7 case redemption which does not pose such risks to creditors.

According to opinions distinguishing *Rash*, the Chapter 13 cramdown risks are nonexistent in the Chapter 7 redemption context because a debtor redeems property for a one-time lump sum payment as opposed to plan payments over time. Creditors in Chapter 7 are said not to

---

**2.** *KELLEY BLUE BOOK USED CAR GUIDE JANUARY–JUNE, 2004 (PP. 3–4)*

**Trade–In Values** represent the dollar amount a consumer might expect a dealer to offer when asking him to take a vehicle in trade. When a dealer buys a vehicle, he must pay somewhat less than the retail value of the vehicle. Kelley Blue Book factors the following expenses into our Trade-in values:

— Most vehicles dealers buy need hundreds or thousands of dollars of reconditioning before they are ready for sale to a consumer.

— Reconditioning can take several days or weeks and the vehicle cannot be sold until it is market ready.

— The dealer usually borrows money to finance the vehicles he has in stock and he must pay interest on the money.

— The dealer may supply a warranty. The dealer must pay the cost of any repairs necessary under the warranty.

— The vehicle may not be one the dealer needs for his used car lot. In such cases, the dealer must pay the cost of finding another dealer willing to buy the vehicle.

— The dealer must the cost of owning and operating the dealership, plus the salaries of the dealership staff.

— The dealer hopes to make a fair profit for his efforts.

**Private Party Values** ... represent the worth of a vehicle in a consumer to consumer transaction. The Private Party Value is the dollar amount a consumer may expect to pay when purchasing from or selling to another consumer. This value assumes that the vehicle caries no warranty, has the appropriate mileage for its age and is in good mechanical and physical condition.

**Retail Values** represent what a dealer may ask for the vehicle once it has been inspected, reconditioned and possibly warranted. This is the "Asking Price" and you may expect to pay less.

*THE AUTOMOBILE RED BOOK FEBRUARY 15–MARCH 31, 2004*

**Average Finance Value** represents the publishers' estimate of the approximate amount for which a vehicle may be financed.

**Average Wholesale Value** represents the publishers' estimate of the approximate wholesale value, ready for resale (with reconditioning costs included).

**Average Retail Value** represents the publishers' estimate of the approximate retail value (including customary warranty).

incur a loss of value through collateral deprecation since they are compensated at the moment of redemption and there is no plan from which the debtor may default. Redemption thus is said to impose no adverse economic consequences on the creditor. *Weathington*, 254 B.R. at 900. As a result, it is argued that there is no need to adopt a valuation standard that compensates or factors in these risks.

The argument does not always hold true. In at least two Circuits debtors may retain and redeem simply by being current on their loan payments. *See Capital Communs. Fed. Credit Union v. Boodrow (In re Boodrow)*, 126 F.3d 43 (2d Cir.1997); *McClellan Fed. Credit Union v. Parker (In re Parker)*, 139 F.3d 668 (9th Cir. 1998). Some risks of default and are certainly present under that practice.

Moreover, although plan default is not an issue in Chapter 7, collateral does depreciate sometime before redemption takes place. The Bankruptcy Code does not confine debtors to a time period within which to actually pay for the right of redemption, *In re Jewell*, 232 B.R. 904 (Bankr.E.D.Tex.1999). Section 521(2)(A) grants debtors a 30 day period to file a statement of intent to redeem, and § 521(2)(B) provides that within forty-five days after filing the notice of intent, or within such additional time as the court fixes, the debtor shall perform the stated intention with respect to such property. *See* 11 U.S.C. § 521. Collateral consisting of a used car declines some in value during this period. Even after a debtor files an intent to redeem and offers payment to do so, moreover, the creditor and debtor may dispute the collateral's value thus requiring a valuation hearing. In the interim, a debtor may continue to use the collateral without adequate protection payments to the creditor. Therefore, the economic consequences of redemption in Chapter 7 and

cramdown in Chapter 13 plan are not, in this context, always so dissimilar as to support a rational for different valuation standards.

Apart from the foregoing, and most pertinent here, the opinions rejecting replacement value in Chapter 7 and purporting to distinguish *Rash* confuse the rationale of the *Rash* ruling with the ruling itself. *Rash* did indeed describe the risks of Chapter 13 cramdown to illustrate how a replacement value standard fits within the governing instructions of § 506(a), but went on to give a clear holding and guidance interpreting § 506(a) in language applicable under any Chapter of the Bankruptcy Code. *See Rash*, at 962, 117 S.Ct. 1879 ("As we comprehend § 506(a), the proposed disposition or use of the collateral is of paramount importance to the valuation question ... the replacement value standard accurately gauges the debtor's use of property."), and further *Rash* footnote 5 quoted above rejecting the "ruleless approach allowing use of different valuation standards based on the facts and circumstances of the individual cases."

The majority opinion in *Rash* did not in any way specify that its reading of § 506(a) was limited only to Chapter 13 cramdown cases, though its stated rationale can be said to apply more to Chapter 13 than to Chapter 7 redemption. Indeed, § 506(a) was recognized by Justice Stevens' spirited dissent in *Rash* as "a provision that applies *throughout* (sic) the various chapters of the bankruptcy code; it is in other words, a utility provision that operates in many different contexts." He warned that the impact of the majority ruling was to give an unwarranted benefit to creditors because § 506(a) applies throughout the Code.

### Reliance on Legislative History was Rejected in Rash

Opinions rejecting a replacement value standard also find support for a liquidation

value standard in the legislative history of § 722, for example the following excerpt from House Report 95–595:

> Another problem in connection with security interests in consumer goods is solved by the provision in the bill of a power of redemption in the debtor. In consumer cases, very often a secured creditor with a security interest in all of the debtor's property, including household and personal goods, uses the threat of foreclosure to obtain a reaffirmation of a debt. Otherwise, the secured creditor is able to deprive a debtor of even the most insignificant household effects, including furniture, cooking utensils, and clothing, even though the items have little if any realizable market value. However, the goods do have a high replacement cost, and thus the creditor is able to use the threat of repossession, rarely carried out, to extract more than he would be able to if he did foreclose or repossess. Under the bill, the debtor may redeem from a secured creditor property that would be exempt in the absence of the security interest, or property that the trustee abandons, if the debtor pays the secured creditor the allowed amount of the creditor's secured claim. *This right amounts to a right of first refusal on a foreclosure sale of the property involved. It allows the debtor to retain his necessary property and avoid high replacement costs, and does not prevent the creditor from obtaining what he is entitled to under the terms of his contract.* (Emphasis supplied.)

*Id.* at 916. H.R. Rep. No. 95–595, at 122 (1977), reprinted in 1978 U.S.C.C.A.N. 5963.

Courts rejecting replacement value standard interpret that legislative history as mandating a valuation standard that imposes low costs on the debtor. For example, the rationale in *Weathington's* argument which has been widely accepted stated that:

> . . . liquidation value best reflects Congressional intent because the commercial reality is that creditors that repossess vehicles most often sell them wholesale at auctions. Indeed, because the process of repossessing and selling a vehicle involves some additional cost to the creditor, it is likely that when a debtor pays the creditor the liquidation value of a vehicle to redeem it, the creditor may actually receive more money than if it had repossessed the vehicle.

254 B.R. at 900.

The legislative history of § 722 cannot be said to mandate a liquidation value standard when Congress did not expressly state a preference for any particular valuation standard in the statutory language. Such language could have been drafted to incorporate a liquidation valuation standard, but was not. Even more significantly, redemption requires payment of an "allowed secured claim." Neither Chapter 7 nor § 722 separately defines a secured claim, and *Rash* looked only to § 506(a) to determine what "allowed secured claim" means. It must be concluded from *Rash* that any definition of a secured claim and a valuation standard under any Code Chapter must come from § 506(a). *See* David B. Wheeler, *Consumer Corner: Redemption Under § 722: Possible End–Run Around Rash,* 1998 ABI JNL. LEXIS 215 (1998). Indeed, the many decisions ruling in favor of wholesale or liquidation valuation are necessarily using § 506(a) for the standard of "allowed secured claim" while struggling to avoid the inflexible interpretation of that provision by the high court.

While legislative history may be instructive when lower courts write on a clean slate, the judicial process does not allow lower courts to interpret legislative background to statutes in order to second guess the Supreme Court once it has inter-

preted a statute. Moreover, the *Rash* opinion expressly discussed and rejected legislative history of § 506(a), including the reference to House Report 95–595 relied on in the lower court opinion that *Rash* reversed:

> n4 We give no weight to the legislative history of § 506(a), noting that it is unedifying, offering snippets that might support either standard of valuation. The Senate Report simply repeated the phrase contained in the second sentence of § 506(a). See S.Rep. No. 95–989, p. 68 (1978)[, U.S.Code Cong. & Admin.News 1978, p. 5787]. The House Report, in the Fifth Circuit's view, rejected a "replacement cost" valuation. See *In re Rash*, 90 F.3d 1036, 1056 (C.A.5 1996) (quoting H. Rep. No. 95–595, p. 124 (1977)[, U.S.Code Cong. & Admin.News 1978, p. 5963]). That Report, however, appears to use the term "replacement cost" to mean the cost of buying new property to replace property in which a creditor had a security interest. See *id.*, at 124. In any event, House Report excerpts are not enlightening, for the provision pivotal here—the second sentence of § 506(a)—did not appear in the bill addressed by the House Report. The key sentence originated in the Senate version of the bill, compare H.R. 8200, 95th Cong., 1st Sess., § 506(a) (1977), with S. 2266, 95th Cong., 1st Sess., § 506(a) (1977), and was included in the final text of the statute after the House–Senate conference, see 124 Cong. Rec. 33997 (1978).

*Rash, Id.,* fn4.[3]

### Policy Arguments Supporting Liquidation Standard Were Rejected in Rash

Policy-based arguments supporting the rejection of replacement value standard emphasize the inflated costs of a replacement value standard. One of the *Amicus* briefs, for example, contended that replacement or retail value standard generally values collateral at such a high value that its adoption would lead to exorbitant costs for debtors and reduce the feasibility of the redemption option. Brief of Macey, Chern & Diab as *Amicus Curie* at 6–7. The Supreme Court recognized that the replacement value standard would impose higher costs than the alternative standard, but that did not deter the Court from adopting it. *Rash* expressly noted that the foreclosure-value is typically a lower standard, but focused on interpreting § 506(a), rather than the financial costs to the Debtor. Policy arguments cannot support rejection of the replacement value standard since that standard was adopted by the Supreme Court in interpreting § 506(a). Arguing policy after the Supreme court has ruled is simply arguing that the Court got it wrong. Lower courts may feel that way, but we have no right to say so under our judicial system.

### Proof of the Vehicle's Value

■ The identification of some factors relevant to calculation of replacement value is within the discretion of the Bankruptcy Courts. *Rash*, 520 U.S. at 964, 117 S.Ct. 1879 n. 6 ("[We leave] to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented.") *Rash* defined replacement value as the price a willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller. At present the record does not contain any

---

**3.** Judge Scalia did not join in fn4 without explanation, but his even more restrictive views about the usefulness of legislative history are well known. *See An Apology For Plain Meaning Interpretation of the Bankruptcy Code,* Emery School of Law Bankruptcy Developments Journal, 10 Bank. Dev. J. 289 at fn.23 (1994).

evidence of the vehicle's replacement value. Were retail value offered, that value would be relevant but subject to adjustment discounting portions of the retail value that debtor does not receive when redeeming the vehicle, such as warranties, inventory storage, reconditioning, and additions of accessories. *See Rash* at n. 6. In the absence of admissible evidence other than published value reports (which as earlier noted no Chapter 13 debtor can afford and no auto financing creditor has yet offered in this court), *Rash* still mandates some reduction from retail value. To comply with that requirement and where no other evidence is presented, retail value will be discounted by a presumed 10% in this court by reason of the factors described above.

### CONCLUSION

*Rash* did not allow for a flexible opening to use a different valuation standard in Chapter 7 cases. As the dissent in *Rash* correctly observed, it was an opinion applicable to § 506(a) in any Bankruptcy Code Chapter, and thus gave an advantage to all secured bankruptcy creditors. While bankruptcy judges had hoped for some room to give greater relief to struggling debtors who need their old cars to save their jobs, families, and homes, we are bound to follow higher authority.

Based on the foregoing analysis, *Rash's* replacement value (or retail value as the recognized valuation books use that term) will apply to redemptions in Chapter 7 under § 722. The value of Smith's vehicle and Household's allowed secured claim must be determined based on that value but adjusted and reduced as provided in *Rash*. Since it is unrealistic to expect expert testimony in a Chapter 7 case to establish value of the discount, a presumed discount of 10% below established retail value will be allowed in this court in ab-

sence of such evidence. Since retail value was not offered here, the motion must be denied without prejudice to a new motion offering adjusted retail value, but is denied with prejudice to the present offer of wholesale value.