In re Danny R. SMITH, Debtor.

No. 04–60200 JPK.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Aug. 27, 2004.

Daniel W. Matern, Macey Chem & Diab, Chicago, IL, for Debtor.

Patrick Lyp, Blachly, Tabor, Bozik & Hartman, Valparaiso, IN, for Creditor.

## ORDER REGARDING VALUATION ISSUES

PHILIP J. KLINGEBERGER, Bankruptcy Judge.

The issues before the Court to which this decision relates concern legal standards and procedures to be followed when a Chapter 7 debtor seeks to "redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt," pursuant to the provisions of 11 U.S.C. § 722.

On March 9, 2004, the debtor in this Chapter 7 case, Danny R. Smith ("Smith") filed a motion to redeem a 1999 Ford Expedition vehicle subject to a security interest held by Illiana Credit Union ("Illiana"). Illiana filed an objection to Smith's motion on March 24, 2004. Pursuant to the Court's order of June 2, 2004, issues relating to the appropriate valuation standard and procedures to be applied in this contested matter are now before the Court for decision.

The dispute between Smith and Illiana constitutes a contested matter within the purview of B.R. 9014. The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and N.D.Ind.L.R. 201(a)(2); this contested matter constitutes a "core" proceeding as defined by 28 U.S.C. § 157(b)(2)(O).

The issue of the standard to be applied to valuation of property which a debtor seeks to redeem pursuant to 11 U.S.C. § 722 has been the subject of a large

number of reported decisions. Nearly every federal court which has reviewed this valuation issue subsequent to the decision of the United States Supreme Court in . *Associates Commercial Corporation v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) has determined that the appropriate valuation standard is that which is designated alternatively as "foreclosure value", "wholesale value", or "trade-in value". One court has determined that the appropriate value is the "retail/replacement value" as determined in *Rash; In re Smith,* 307 B.R. 912 (Bankr.N.D.Ill.2004). Quite recently, another court has determined that a "splitting of the difference" approach—very similar to that adopted by the Seventh Circuit Court of Appeals in the context of a Chapter 13 case in *In re Hoskins,* 102 F.3d 311 (7th Cir.1996)—is to be applied; *In re Stark,* 311 B.R. 750, 756 (Bankr. N.D.Ill.2004).

This Court adopts the standard which will be designated as "wholesale value", which will be later explained in this decision.[1]

Exploration of the issues before the Court must begin with 11 U.S.C. § 722, which states:

An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien.

11 U.S.C. § 521(2) provides the only other provision of the Bankruptcy Code which relates to redemption, stating as follows:

(2) if an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate—

(A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, or within such additional time as the court, for cause, within such period fixes, the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property;

(B) within forty-five days after the filing of a notice of intent under this section, or within such additional time as the court, for cause, within such forty-five day period fixes, the debtor shall perform his intention with respect to such property, as specified by subparagraph (A) of this paragraph; and

(C) nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title;

---

1. Counsel for both parties have submitted well-prepared memoranda. As one might expect, a significant portion of Smith's memorandum is devoted to a discussion of the nearly-unanimous majority view of valuation. As also might be expected, Illiana's memorandum concentrates on *In re Smith,* 307 B.R. 912 (Bankr.N.D.Ill.2004), which until several weeks ago was essentially the only published decision which departed from the "foreclosure/wholesale/trade-in" standard.

B.R. 6008 states the manner in which issues relating to redemption are to be brought before the Court:

> On motion by the debtor, trustee, or debtor in possession and after hearing on notice as the court may direct, the court may authorize the redemption of property from a lien or from a sale to enforce a lien in accordance with applicable law.

■ There is nothing in any of the foregoing provisions which provides the valuation standard to be applied to redemption of property under § 722. While some courts have looked to the "legislative history" of § 722, this Court expressly declines to do so. While legislative history is difficult enough to ascertain—let alone apply to issues concerning the construction of an ambiguous statute—it has absolutely no application to a statute, such as 11 U.S.C. § 722, which is *completely silent* on the subject matter to which the legislative history is deemed to apply. For example, in *Rash* the Supreme Court declined to give any weight to the legislative history of 11 U.S.C. § 506(a) in determining the appropriate valuation standard for "cram down" of the value of personal property which a Chapter 13 debtor's plan proposed to retain, noting that the critical provision for the Court's analysis did not appear in the version of the legislation addressed by the legislative history; *Rash*, 117 S.Ct. 1879, 1886 [footnote 4]. As was true with the issue before the Supreme Court under § 506(a), no weight can be accorded to the legislative history of § 722 in determining the valuation standard to be applied to a redemption.

As stated in *Rash, supra,* the benchmark for the valuation process, including that under § 722, is 11 U.S.C. § 506(a), the last sentence of which states:

> Such value shall be determined in light of the purpose of the valuation and of *the proposed disposition or use of such property,* and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest. (emphasis supplied)

The concepts of "disposition" and "use" are mutually exclusive. "Disposition" means that the debtor will no longer retain the property, which of course is not what happens in a redemption. It is valuation in light of the use of the collateral by the debtor, in relation to the creditor's interests in the collateral, that is at issue here.

■ The § 722 redemption valuation standard is absolutely controlled by the analytical basis of the Supreme Court's decision in *Rash*.[2] The analytical lynchpin is the following statement from that decision:

> As we comprehend § 506(a), the "proposed disposition or use" of the collateral is of paramount importance to the valuation question. If a secured creditor does not accept a debtor's Chapter 13 plan, the debtor has two options for handling allowed secured claims: surrender the collateral to the creditor, see § 1325(a)(5)(C); or, under the cram down option, keep the collateral over the creditor's objection and provide the creditor, over the life of the plan, with the equivalent of the present value of the collateral, see § 1325(a)(5)(B). The

---

2. The direct holding in *Rash* does not apply to redemptions in a Chapter 7. That decision directly determines only the issue of the valuation standard to be applied in a Chapter 13 case in which the debtor utilizes what the Court denominated as the "cram down" provisions of Chapter 13 to provide for payment

of the allowed secured claim of a creditor over a period of time up to and including the end of the debtor's plan as determined under 11 U.S.C. § 1322(d). Thus, *Rash* does not require the utilization of the "retail/replacement" value therein determined in the context of a § 722 redemption.

"disposition or use" of the collateral thus turns on the alternative the debtor chooses—in one case the collateral will be surrendered to the creditor, and in the other, the collateral will be retained and used by the debtor. Applying a foreclosure-value standard when the cram down option is invoked attributes no significance to the different consequences of the debtor's choice to surrender the property or retain it. A replacement-value standard, on the other hand, distinguishes retention from surrender and renders meaningful the key words "disposition or use."

Tying valuation to the actual "disposition or use" of the property points away from a foreclosure-value standard when a Chapter 13 debtor, invoking cram down power, retains and uses the property. Under that option, foreclosure is averted by the debtor's choice and over the creditor's objection. From the creditor's perspective as well as the debtor's, surrender and retention are not equivalent acts.

When a debtor surrenders the property, a creditor obtains it immediately, and is free to sell it and reinvest the proceeds. We recall here that ACC sought that very advantage. See *supra*, [117 S.Ct.] at 1882. If a debtor keeps the property and continues to use it, the creditor creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use. Adjustments in the interest rate and secured creditor demands for more "adequate protection," 11 U.S.C. § 361, do not fully offset these risks. 117 S.Ct. at 1885.

This passage does not mean that mere "retention" of property triggers the "replacement" analysis adopted by *Rash*. The true underpinning of *Rash* is its focus on the "double risk" of a debtor's retention of property in a Chapter 13 case and payment of the value of the creditor's allowed secured claim over time.[3] This scenario subjects the secured creditor to both the risk of a subsequent default—and that default's attendant costs and expenses—and to the deterioration of the value of the creditor's lien over the duration of the term of repayment. Properly construed, it is this "double risk" which requires the utilization of a "replacement" value in a Chapter 13 case—not the mere fact that the debtor retains the collateral.

■ As a number of other courts have noted, the period of time within which the full redemption value must be paid to the

---

3. Query as to the valuation standard in a Chapter 13 case in which the debtor proposes to "cash out" the amount of the allowed secured claim upon the effective date of the plan, rather than to pay that value over some term under the plan. In the initial stages of its decision, the Supreme Court stated that 11 U.S.C. § 1325(a) allows for only three possible alternatives: acceptance of a plan by a secured creditor; surrender by the debtor of the property to the creditor; and what the Court stated to be the "so-called 'cram down' power", which was explained as follows:

Under the cram down option, the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, see

§ 1325(a)(5)(B)(I), and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, *i.e.*, the present value of the collateral, see § 1325(a)(5)(B)(ii). 117 S.Ct. at 1882–83.

Although unlikely, it is possible that a Chapter 13 debtor could have available the funds necessary to "cash out" a creditor's allowed secured claim on the effective date of the plan; with all due respect to the Supreme Court, such a plan provision would absolutely comply with 11 U.S.C. § 1325(a)(5)(B)(ii). The appropriate valuation standard in a Chapter 13 case in this context is not before this Court in this case.

creditor is relatively short. As stated in § 521(2)(A), the debtor must file a statement of intention regarding redemption within 30 days of the filing of the petition, or on or before the date of the § 341 meeting, whichever is earlier; as provided by § 521(2)(B), the debtor must perform his intention within 45 days after the filing of the required notice of intent.[4] While apparently several Circuits adopt the view that a redemption value may be paid over time, that option is not available in the Seventh Circuit: the redemption value must be paid in full within the period provided by § 521(2)(B); *See, In re Bouzek*, 311 B.R. 239 [headnote 2] (Bankr. E.D.Wis.2004); *In re Stark*, 311 B.R. 750 (Bankr.N.D.Ill.2004). As a result, the "double risk" standard which drove the Supreme Court's determination in *Rash* does not apply in a redemption context in the Seventh Circuit. Because of the time constraints imposed by §§ 521(2)(A) and (B), the concept of "risk of default" as discussed in *Rash* does not apply to a redemption. Additionally, because the redemption value must be paid in full within those time limitations, the second risk—that of deterioration of collateral over an extended payment term—is very limited in the redemption context.

It is instructive to note that in *Rash*, the Supreme Court referred to only three possible valuation standards: "foreclosure-value", "replacement-value", and a "midpoint between foreclosure value and replacement value"; *Rash*, 117 S.Ct. 1879, 1883–84. The Court specifically eschewed the "midpoint" method, and it is thus clear to this Court that the Supreme Court has determined that the choice of valuation standards for a § 722 redemption is either a foreclosure value or a replacement value.

■ As noted previously, nearly every court that has addressed the § 722 valuation issue has adopted a standard stated to be "foreclosure", "wholesale" or "trade-in" value. Many of these courts then gloss these terms with the statement that the adopted value is "what a secured creditor would receive if it repossessed the collateral and sold it in the most beneficial manner it could," *See, In re Washington*, 2003 WL 22119519 [footnote 6] (Bankr.E.D.Ark. 2003). The concept of the gross sales price of collateral at a liquidation sale is a much different one from that of the net proceeds received by a creditor from that sale. The latter—the "net to seller" will be less than the liquidation sales price due to the incursion of costs of sale (e.g., repossession, transportation, storage, and sales commission expenses) by the seller. Careful reading of all of the decisions which adopt the "foreclosure/wholesale/trade-in" valuation standard makes clear that the valuation decreed by those decisions is to be determined by the gross sales price, and not by the net proceeds received by the secured creditor.[5] Moreover, there is *some* risk inherent in the redemption process even absent a redemption which requires a valuation hearing—and thus a more time-consuming procedure: § 521(2) provides the debtor with a minimum of 75 days to pay the secured creditor the full redemption value of the subject collateral. During this time, the debtor will almost always be in possession of the collateral and will be using it, thereby subjecting the subject property to risks of deterioration,

---

4. The periods specified in §§ 521(2)(A) and (B) are subject to extension by the court "for cause".

5. If the "net proceeds to seller" amount were used, a factual element concerning costs in-

curred by a secured creditor would be introduced into every redemption sought by a debtor under § 722, which would only delay proceedings in the redemption matter.

damage or loss. The use of the actual "wholesale" sales price—as opposed to the net proceeds of the sale which would be received by the secured creditor—is necessary to compensate for these risks under the principles of *Rash.*

The next issue which surfaces is the manner in which the value is to be determined. In the purest valuation sense, a true value can be established only by selling the subject collateral itself under the circumstances by which the valuation standard is to be determined. That, of course, is not possible in a redemption. The next best mechanism of proof is to utilize an expert who can qualify as such under Rule 702 of the Federal Rules of Evidence. To really be valuable in the valuation process, such an expert would have to have had broad experience with the sales prices received for vehicles essentially comparable to that being valued. This is essentially the "comparable sales" method of valuation. The odds of an expert's possessing significant experience with wholesale/auction sales of vehicles having nearly identical purchaser-relevant characteristics (e.g., mileage, interior/exterior condition, need for repairs, and/or accessories) to those of the vehicle being redeemed are extraordinarily remote. Moreover, in the real world context of utilizing a qualified Rule 702 expert, Chapter 7 debtors will seldom be able to afford to do so, and Chapter 7 creditors will seldom desire to incur the expense for preparing an expert for a valuation hearing and having the expert attend that hearing. While it is true that an owner is always a competent witness to provide testimony as to the value of his/her property, under Rule 701(a) of the Federal Rules of Evidence, even an owner must have some basis for his opinion of value, which—under the valuation standard adopted by the Court—most owners simply will not have.

In the Court's view, most courts which have addressed evidentiary issues concerning valuation of motor vehicles under § 722 have essentially glossed those issues to obtain a somewhat pragmatic "base value" approach. Most courts use a motor vehicle valuation handbook as the primary standard for determining the value of a specific vehicle. The standard mechanism for admission of a vehicle handbook valuation is through Rule 803(17) of the Federal Rules of Evidence, which is a rule concerning exceptions to the exclusion of hearsay; (*see, e.g., In re Smith*, 307 B.R. 912, 913 (Bankr.N.D.Ill.2004)). However, because motor vehicles are not completely fungible articles, the base evidentiary issue concerning use of valuation handbooks is not one of hearsay, but rather one of relevancy to the valuation issue at hand. As has been noted to a number of counsel in various proceedings concerning valuation of property—particularly in reference to motor vehicles—the Court is skeptical of the *relevance* of standard valuation handbooks to the issue of the value of a specific vehicle: the handbooks derive what is in essence a "mean" value based upon whatever input data are used to establish that value. In actuality, every motor vehicle has some quirk, maintenance problem, or enhancement which will cause it to deviate from this absolute mean. Given the breadth of "relevant evidence" under Rule 401 of the Federal Rules of Evidence ("evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" [emphasis supplied] ), the jumping off point provided by valuation handbooks probably satisfies the federal evidentiary standard of relevance. However, adjustments from the handbook's mean value—without the use of a qualified expert—is highly problematic. With all due respect to other courts, even

more suspect is the offhanded adjustment of values based upon non-expert testimony of the pluses or minuses of a particular vehicle, such as that encountered in cases like *In re Henderson*, 235 B.R. 425 (Bankr. C.D.Ill.1999) [in which, based upon the debtor's testimony as to general condition and costs of repair, and factoring in high mileage, a deduction from the NADA "trade-in value" of $525.00 was made].

The point of the foregoing is that the ascertainment of an accurate "wholesale" value for a motor vehicle is almost impossible to do within the parameters of the Federal Rules of Evidence, especially without an expert qualified as such under F.R.E. 702. Even to the extent possible under evidentiary criteria, totally particularized valuation is very expensive and time-consuming, certainly beyond the financial ability of nearly any debtor, and even beyond the cost most creditors are willing to incur to determine the value of a used, and sometimes abused, vehicle. This Court views the evidentiary issue of establishing the "wholesale" value of a motor vehicle sought to be redeemed under 11 U.S.C. § 722 to be an issue best served by the adoption of a nearly absolute standard, a standard which is no less arbitrary than any mechanism which glosses true evidentiary principles applicable to a valuation of this nature. In this context, the "mean" of the valuation source which the Court has chosen will over the long run of cases average out to the benefit of both debtors and creditors in terms of the certainty of the cost of redemption. While in any particular case, the "mean" approach may disadvantage a debtor or a creditor, as so aptly stated by Mr. Spock in *The Wrath of Khan*, "the needs of the many outweigh the needs of the few". Certainty as to the valuation mechanism serves the needs of the many.

■ The Court adopts as the valuation standard for § 722 redemptions, the "average trade-in" value of the Official Used Car Guide of the National Automobile Dealers Association ("NADA Guide")[6]. The Court has chosen the NADA Handbook, as opposed to other sources such as the Kelly Blue Book, based upon the Court's perception that the NADA database is much broader than that of other services, and particularly based upon the Court's perception that most repossessed vehicles are sold at auctions whose results are included in the NADA database. In the event that the NADA service publishes values for the region in which the Court is located, it is that value which controls; in the event that the value quoted is a national average, it is the national average value that controls.

■ The base valuation so established is subject to two exceptions:

(1) If, and to the extent that, the NADA Guide *itself* states an adjustment for the particularized vehicle features of (a) accessories; (b) condition; and/or (c) mileage, those adjustments will apply.

---

**6.** The Court recognizes that this value is based on the assumption that the subject vehicle has certain characteristics, stated as follows in the NADA's publications:

Average Trade-in—An Average Trade–In vehicle should be clean and without glaring defects. Tires and glass should be in good condition. The paint should match and have a good finish. The interior should have wear in relation to the age of the vehicle. Carpet and seat upholstery should be clean and all power options should work. The mileage should be within the acceptable range for the model year. The "Average Trade–In" value is a national average calculated from the Official Used Car Guide's ten regions. The "Average Trade–In" value for your vehicle could be higher or lower than the national average due to your local market conditions.

■ (2) Any valuation so derived from the NADA Guide may be challenged by the testimony of an expert qualifying as such under Rule 702 of the Federal Rules of Evidence. The use of any such expert in a redemption valuation hearing will be governed by the expert disclosure/report requirements of Rule 26(a)(2), which are applicable to a contested matter concerning redemption valuation by operation of B.R. 9014(c) and B.R. 7026. The qualification of a witness as an expert is subject to the requirements of Rule 702 of the Federal Rules of Evidence. The admissibility of a debtor-owner's testimony under Rule 701(a) of the Federal Rules of Evidence requires a foundation that the owner has a rational basis, based on personal factual investigation, to state an opinion which departs from the value established by the NADA Guide, as potentially adjusted pursuant to subparagraph (1) above.

In a particular case, either of the parties may chafe at the adoption of this absolute standard by contending that the particular vehicle at issue does not meet the criteria of the prototypical "trade-in" vehicle described in the NADA Handbook. In a circumstance in which the debtor might contend that the standard overvalues the vehicle, as noted above there is an element of risk in the debtor's retention of possession of a vehicle during the redemption period provided by 11 U.S.C. § 521(2), and thus the potential sometime overvaluation compensates for this risk element. Pragmatically, in the Court's experience there will be few circumstances in which a creditor will claim undervaluation, as most institutional creditors who appear in this Court appear to rely on the NADA handbook to establish their asserted value.

Under the provisions of 11 U.S.C. § 362(d) and N.D.Ind.L.B.R. B–2002(a), it is theoretically possible for a secured creditor to obtain relief from the automatic stay in a Chapter 7 case within 15 days of the date of filing the petition, and to then exercise its available remedies under Article IX of the Uniform Commercial Code to obtain possession of the collateral immediately after the lifting of the stay. The Court notes to both debtors and creditors that despite its view that the only valid objection by a debtor to a Chapter 7 stay relief/abandonment motion is that the collateral sought to be affected by the motion is subject to administration by the Chapter 7 Trustee for the benefit of creditors because it has equity beyond the combined value of secured claims and exemptions, the Court will diligently seek to not entertain "drop dead" stay relief motions until after the expiration of the 30–day period provided for the debtor's statement of intention under § 521(2)(A). The Court also notes to debtors that § 722 requires as a pre-condition of redemption that the property subject thereto has been exempted under 11 U.S.C. § 522 or has been abandoned under § 554, which *ipso facto* means that the property has no value as an administrable asset to a Chapter 7 Trustee. The circumstances in which creditors seek relief from the stay or abandonment in a Chapter 7 case within days of the filing of the petition are very rare. The Court assumes that if a debtor timely states an intention to redeem property pursuant to § 521(2)(A), even a creditor who is granted relief from the stay or abandonment will refrain from repossessing its collateral/depriving the debtor of possession of the collateral for the period provided for by § 521(2)(B). However, in the Court's view, possible redemption is not a defense to a stay relief/abandonment motion, and the lifting of the stay and/or the granting of abandonment does entitle a secured creditor to the exercise of its available state law remedies, including repossession of collateral. But where a timely statement of intention to redeem has been filed

in accordance with § 521(2)(A), and a motion for redemption has been filed pursuant to B.R. 6008 which accords with the provisions of 11 U.S.C. § 521(2)(B), the Court will entertain an adversary proceeding under B.R. 7001(7) to enjoin the creditor from disposing of the collateral until the redemption period of § 521(2)(B) has expired.

■ The remaining issue is the time at which the redemption value is to be determined. The choices are: the date of the petition; the date upon which the statement of intent pursuant to § 521(2)(A) is filed; the date upon which the redemption payment is due under § 521(2)(B); or in the event of a contested hearing, the date of the hearing. There is no clear answer to this issue in a similar context—for example, with respect to valuation for the purposes of 11 U.S.C. § 1325(a)(5) cram downs, courts are all over the board. Again, this is an issue in the context of the procedure with which we are dealing that requires an absolutely certain standard. Because the Court's decision is geared toward the "risk" analysis decreed by *Associates Commercial Corporation v. Rash*, *supra*, the actual "risk" incurred by the secured creditor begins upon the implementation of the automatic stay under 11 U.S.C. § 362(a), which of course is the date of the petition. Thus, the date upon which the valuation under § 722 is to be determined is the date upon which a Chapter 7 debtor initiates a case implementing the automatic stay against the secured creditor.

Based upon the foregoing, IT IS ORDERED as follows:

A. In a redemption pursuant to 11 U.S.C. § 722, the value to be paid by a debtor to a secured creditor is the gross sales price which would be realized from sale of the subject motor vehicle, without deduction of costs or expenses which might be realized by a secured creditor in arranging for and effecting that sale. The Court denominates this value as "redemption value".

B. The "redemption value" will presumptively be deemed to be the NADA Official Use Car Guide's statement of the "Average Trade-In" value of vehicles having the same model year, and having the same make and model, as that subject to redemption. If an NADA published guide exists for the region in which this Court is located, that value will control; if there is no such regional publication, the national average value shall control. This standard is subject to the following:

(1) If, and to the extent that, the NADA Guide *itself* states an adjustment for the particularized vehicle features of (a) accessories; (b) condition; and/or (c) mileage, those adjustments will apply.

(2) Any valuation so derived from the NADA Guide may be challenged by the testimony of an expert qualifying as such under Rule 702 of the Federal Rules of Evidence. The use of any such expert in a redemption valuation hearing will be governed by the expert disclosure/report requirements of Rule 26(a)(2), which are applicable to a contested matter concerning redemption valuation by operation of B.R. 9014(c) and B.R. 7026. The qualification of a witness as an expert is subject to the requirements of Rule 702 of the Federal Rules of Evidence. The admissibility of a debtor-owner's testimony under Rule 701(a) of the Federal Rules of Evidence requires a foundation that the owner has a rational basis, based on personal factual investigation, to state an opinion which departs from the value established by the NADA Guide, as potentially adjusted pursuant to subparagraph (1) above.

C. The relevant date for determination of the redemption value is the date of the

Chapter 7 debtor's filing of a petition which implements the automatic stay against the secured creditor against whom redemption is sought.

IT IS FURTHER ORDERED, pursuant to the Court's order of June 2, 2004, that a final pretrial conference will be held on **October 4, 2004, at 1:00 o'clock P.M.** with respect to the contested matter arising from the objection of Illiana Credit Union to the motion of Danny R. Smith to redeem a 1999 Ford Expedition from the interests of that creditor.